## CITY OF PARIS.

1. The rule declared in the preceding case as to the obligation of large steam vessels moving in a crowded harbor, like New York, to move slowly and to keep themselves under such entire control as to be able to stop on short notice, declared anew.

2. Such steamers should keep a vigilant lookout, and if they enter narrow passages, between other vessels, do so only when they plainly see that they can proceed through them without danger to other vessels. If notwithstanding all their caution and vigilance they see any vessel approaching, so as to make a danger of collision, they should stop and reverse their engine as soon as is possible.

THIS was an appeal in admiralty from the decree of the Circuit Court of the United States for the Southern District

of New York; affirming a decree of the District Court on a libel in admiralty; the waters where the collision took place having been the very same as in the collision in the last case; those, namely, between Jersey City and the Battery at New York.

Mr. Justice SWAYNE stated the facts and delivered the opinion of the court.

The cause was one of collision. The vessels concerned were the schooner Percy Heilmar and the steamer City of Paris. The schooner was 78 feet in length; her tonnage, new measurement, was 107 tons; her carrying capacity was about 170 tons. The City of Paris was an iron screw steamer. She was 375 feet long, and 40 feet beam. Her register was 1669 tons, English measurement. Her engines were 600 horse power. The schooner was laden with coal, and was on a voyage from Philadelphia to Pawtucket, Rhode Island, by way of Long Island Sound.

The steamer was engaged in running between the ports of New York and Liverpool. The collision occurred on the morning of the 14th of April, 1866, below the Battery, in the North River. The schooner had arrived at the port of New York that morning. The tide being unfavorable for ascending the East River, she stood over towards Jersey City to find a suitable place to anchor, intending to wait there until the tide in the East River should be favorable. While proceeding to carry out this purpose, heading about west by north, with the wind free, the steamer ran into her, striking her on the starboard side, about the main chains. The blow was of such violence as to prostrate her mainmast and cut her nearly in two. As soon as she was struck the steamer put on steam and carried her forward to avoid raking, or being raked by other vessels, which the pilot of the steamer says " would have done more damage than sinking a dozen schooners." The schooner hung for a time on the steamer's bow. The pilot says: " As soon as we got below, a little out of danger, a little room, then we stopped the steamer, backed on her hard, backed out from the schooner, and she

went down." All this happened so quickly that those on board had difficulty in escaping with their lives. They lost everything else. The captain was knocked overboard and rescued by a small boat which happened to be present.

The course of the schooner was nearly at right angles with the course of the steamer. It lay between a brig and a ship—both with their heads to the eastward, and one a little astern of the other. They were about three hundred feet apart. The brig was on the starboard and the ship was on the port side of the schooner. The course of the steamer was between the same vessels, with the ship on the starboard and the brig on her larboard side. The pilot says he picked out this course, though it was "pretty narrow." The subject was talked over. His plan was to go under the stern of the brig and ahead of the ship.

As almost invariably happens in this class of cases, each vessel has a theory which vindicates itself and condemns its adversary; and, as usual, each theory is earnestly supported by those on board the vessel which propounds it. In this case it is clear there is fault and responsibility somewhere. Our duty is to find where they belong and to pronounce accordingly. The District Court adjudged against the steamer, and the Circuit Court affirmed the decree.

The theory of the schooner is, that she was keeping her course, as she had a right to do, and that the steamer was wholly in fault. The steamer maintains that as soon as the schooner had passed under the stern of the brig, she descried the steamer for the first time and luffed, intending to pass between the brig and the steamer; that the steamer backed hard to enable her to do so, and that the schooner thereupon immediately fell off into the line of the steamer's course, and thus brought about the catastrophe. The steamer insists that if the schooner had kept her course, without luffing, the steamer would have passed under her stern; that if the schooner had continued her course after luffing, she would have passed between the steamer and the brig, and that her subsequent change of course was a gross fault, the sole cause of the collision, and deprives her of all

claim to damages for the consequences. These conflicting views define the sphere of our inquiries in the case.

The morning was clear. The river was crowded with vessels sailing and at anchor. The condition of things required the greatest circumspection on the part of the steamer. Her rate of speed was probably from seven to eight miles an hour. The combined speed of both vessels was not less than ten miles an hour. The schooner was first seen by Mathewson, who was then, and had been from the time the steamer left the wharf, on her forecastle head as a lookout. He says that when first seen the schooner was from three to four points off the port bow of the steamer, and, he thinks, was distant about four hundred yards. Captain Kennedy, of the steamer, thinks she was a quarter of a mile off. Estimates of distance, under such circumstances, are little to be relied upon. It is to be presumed the witnesses in this instance made it large enough. Conceding that the distance to be passed by both vessels, to the point of collision, was a full quarter of a mile, the combined speed of ten miles an hour would have brought them together in a minute and a half. Mathewson reported the schooner as soon as he saw her. The orders that were given show the perturbation which existed. Captain Kennedy says : "When the schooner was reported, the pilot and myself both ordered the helm hard a-starboard. I said, along with the pilot, hard a-starboard, and at the same time reduced the engines dead slow. . . . The next order was to stop the engines and reverse full speed. I worked the indicator myself." The orders to slow, to stop, and to reverse the engines came too late. The steamer had but a little way to go. The headway she was under could not be arrested at once. It carried her forward with such force that her impact was necessarily fatal to the schooner. Her starboarding did no good. She could not go to the port side more than two points without colliding with the brig. She passed within an ordinary ship's length of the stern of that vessel.

We think that if there had been due care and vigilance the schooner would have been seen at an earlier period.

There was nothing to prevent it. The result evinces gross negligence. As soon as it was seen that the schooner was approaching the track of the steamer, the steamer should at once have stopped or reversed her engines, and have done all in her power to avert the impending peril.* She ought not to have entered upon the narrow track between the ship and the brig, without being very careful first to see that her passage would involve no danger to any approaching vessel in its transit.

The results proved that the speed of the steamer was higher than was consistent with the safety of other vessels in so crowded a thoroughfare, and hence higher than she was warranted to assume.

For these faults she must be condemned.

Was the schooner in fault?

When she passed the brig and reached the steamer's track she was pursuing her regular course. This she had a right to do, and the duty rested upon the steamer to see her and keep out of her way.† At this point blame is imputed to her. Locman, the pilot on the brig, says, "she luffed a little, and then kept off immediately after she luffed." The pilot on the steamer says she luffed "a very little while. It seemed to me about long enough to get his wheel down and then hove it up again. He appeared to be in a confused state; got frightened, and did not know exactly what to do." The conduct of the schooner must be considered in the light of the facts. They were enough to produce consternation. As she passed the stern of the brig the peril of her position became apparent. A steamer of immense power was bearing down directly upon her, and rapidly approaching. Escape seemed impossible and destruction inevitable. There was no time for reflection or precaution. The vessel and the lives of all on board were at stake. The acts complained of were done in the excitement of the moment, and *in extremis.* Whether they were wise it is not material to inquire. If

---

* Acts of Congress, April 29th, 1864, 13 Stat., 61, art. 16.

† Act of 1864, art. 15.

unwise, they were errors and not faults. In such cases the law in its wisdom gives absolution.* It is by no means clear to our minds that if the schooner had failed to luff the results would not have been still more disastrous. It is quite probable that the steamer would have struck her midship, have passed over her, and destroyed the lives of all on board. Her conduct neither caused nor aggravated the catastrophe. After reaching the steamer's track she had no power to avoid it. We find in the record no ground upon which we can hold her responsible in any degree for the casualty.

The fact that both the courts below concurred in condemning the steamer and in exonerating the schooner is entitled to our respectful consideration.† .

DECREE AFFIRMED.

* The Grace Girdler, 7 Wallace, 201.                    † Ib.