## THE ST. JOHN.

### DELAHOUSAYE v. ADVANCE COAL CO.

#### (Circuit Court of Appeals, Fifth Circuit. February 20, 1893.)

#### No. 59.

1. COLLISION—BARGE AT LANDING—LIGHTS.

A coal barge, 175 feet long, 26 or 27 feet wide, and 9 feet deep, was made fast about 10 or 15 feet from the bank of the Palo Alto plantation landing on Bayou Laforche, La., where the bayou is about 200 feet wide, with sloping banks, deep water on the side where the barge lay, and shoal water on the other side. *Held,* that the barge was subject to rule 12, Rev. St. § 4233, and bound, by the provisions adopted by the board of supervising inspectors, January 19, 1881, to "carry one bright white light forward, not less than six feet above the rail or deck."

2. SAME—VESSELS IN MOTION AND AT REST.

A steamer going up the bayou was making at most five miles an hour. There were but few meeting or passing vessels, and no anticipated obstacles. The night was hazy, dark, and rainy. The deck of the barge was but two feet above water, and there was no light displayed. The steamer saw the barge at a distance of about 175 feet, and immediately, but in vain, used every effort to avoid a collision. *Held,* that the steamer was not in fault.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

In Admiralty. Libel by the Advance Coal Company against the steamboat St. John, L. P. Delahousaye and others, owners, for damages for a collision. The district court entered a decree for libelant, and the owners of the steamer appealed. Reversed.

Statement by LOCKE, District Judge:

On the 10th of January, 1891, a coal barge known as "Advance Coal Co., No. 68," 175 feet long, 26 or 27 feet wide, and 9 feet deep, laden with some over 9,000 barrels of coal, was made fast along the bank at the landing place at Palo Alto plantation, on Bayou Lafourche, La. At about 1 o'clock the morning of the 11th the steamer St. John, a stern-wheel river boat, about 175 or 180 feet long, and including guards, 58 feet wide, was coming up the bayou, and in passing either struck her or was struck by her, breaking her adrift. The barge floated down the bayou about a mile or a mile and a half, when another steamer, the Lafourche, pushed her ashore, and the men who had been in charge of her, and followed her down the bank, made her fast. Early the next morning she was found sunk where tied, one side of her slightly above the surface of the water, but mostly submerged. Much of the coal was taken out, but with aditional labor and expense, which, together with the loss of the boat and a portion of the coal, caused a damage to the owners, for which suit was brought by a libel in admiralty against the steamer St John. Upon a hearing the steamer was found to be in fault, and judgment for $1,969.28 given against her, from which an appeal has been taken to this court.

Wm. Wirt Howe and S. S. Prentiss, for appellants.

W. S. Benedict, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and LOCKE, District Judge.

LOCKE, District Judge, (after stating the facts.) In this, as in most cases of alleged collision, the important questions are those of fact, which can only be satisfactorily determined by a careful examination of a large mass of testimony so conflicting that the best that can be done is to determine by a preponderance of evidence the probability of the truth of one or the other state of facts relied upon by the parties.

The one vessel was stationary, tied to the bank, with no motor power; the other, a steamboat under way; and the presumption of the fault of the moving vessel must be overcome, if at all, by direct and positive proof which changes this presumption. The uncontradicted facts are that the Bayou Lafourche at the place where the coal barge was lying was then about 200 feet in width, with sloping banks; the deeper water being on the northerly side, where the coal barge was lying, with a shelving bank or ridge of shoal water on the other side. The depth of water at Donaldsonville, 2 miles above, was, by gauge, 12½ feet; at Palo Alto a little less, probably about 11.9 or 12 feet. The coal barge had nearly perpendicular sides, with no curvature of bilge, with a depth of about 7 feet below the water line. This would necessarily prevent a very near approach to the bank, and it may be safely considered that the statement of the mate of the tug that towed and made her fast there, that the boat lay some 10 or 15 feet from the

bank, was probably correct. This is the most favorable statement for the libelant that is found in regard to the original location of the barge which can be relied upon. Mr. Darton, civil engineer in charge of the dredging works of the bayou, thinks, in order to get 7 feet, you would have to go out from the bank 25 feet; but, accepting the statement of the party that made the barge fast, it must have been projecting not far from 40 feet into the channel, where the entire width was about 200 feet, with the deepest water on the side where she was lying. This location would unquestionably bring the boat within the provisions of rule 12 of section 4233 of the Revised Statutes, which provides that "coal boats * * * or other water craft navigating any river by hand power, horse power, sail, or the current of the river, or which shall be anchored or moored in or near the channel or fair way of any * * * river, shall carry one or more white lights, which shall be placed in such manner as shall be prescribed by the board of supervising inspectors of steam vessels."

At a meeting of the board of supervising inspectors of steam vessels, January 19, 1881, it was provided that boats or vessels of this class "shall carry one bright white light forward, not less than six feet above the rail or deck;" and this was the law at the time. This boat was unquestionably a coal boat moored in or so near the channel of a river as to come under the requirements of this law. This brings us to the important and difficult question of this case whether or not the boat at the time of the alleged collision was complying with the law and exhibiting any light. There is no evidence that the law was complied with in the location of any light testified to, but six of the negroes in charge of the boat—the coal wheelers who were to discharge the coal, and in whose charge the boat was left after having been tied up by the officers of the tug who brought her there—state in their testimony that there was a clear white light on the top of the check post in the middle of the boat, about two or three feet above the rail; but this is so directly contradicted by a much larger number of apparently credible witnesses that it becomes an important and difficult question to determine.

This testimony, as in all collision cases, has to be considered in view of all the facts and circumstances surrounding the occasion, and the truth or falsity of the statements estimated and measured by all the lights so obtained. Were not the parties testifying to the existence of the light on the boat positively contradicted, the apparent recklessness of their swearing in regard to other matters would awaken a question as to the reliability of their statements. Williams, the foreman who had charge of the gang, would not admit that he left the vicinity of the boat at all; but declared that, from the time of the landing, with the exception of a few moments before dark, when he went to the store to get some provisions, he was walking the bank in the rain and mud, on the lookout, the entire night; that he did not even go into the house for his supper, but had it brought to him. He never went to sleep at all; walked around on the bank all the time. Another witness claimed that

he also was walking on the bank, carrying a lantern continuously. Two more stated that they were on the coal boat, getting coal, at the time the steamer came along; and only two out of the six admitted that they had been in the pump house, where they had a fire, and cooked and had their supper, and were to sleep that night.

When we consider that these were laboring men, who had been hard at work until dark, getting up the runs, in the rain and wet, and the character of the night, and that there was not the slightest necessity for their remaining out on watch if there had been a light on the boat, the improbability of their story is apparent. But this inconsistency sinks into insignificance when the contradictory evidence is examined. It appears from the testimony of one of the witnesses for the claimant that Wash. Johnson, one of the libelant's witnesses, who testifies that he put the light on the post, and testifies also very fully about the facts of the collision, and how rapidly the boat was filling, and what the mate of the Lafourche said about her condition when she was checked and pushed into the bank, was not there at all that night, but had left at about 6 that evening, and was asleep in the house of another witness, some two miles distant. Were this the only point upon which Johnson was contradicted, it might be but one witness contradicting another, and leave a doubt in the mind; but he is so positively contradicted in other matters also that we must believe that he was not there, and knew nothing about it.

James Holmes, another witness, testifies that while at the store where the foreman, Williams, was, between 8 and 9 that evening, he heard some one tell Williams that he had better go down and have a light put out on the boat, and that Williams told one of the men to go, but that he replied that there was but one lamp that had any oil in it. Williams told him to go and put that up, but the man did not go, but staid there. As to the positive testimony regarding the absence of a light, John Jackson, a resident farmer, living within a short distance of the boat, went out about 11 o'clock to see about some carts of his going by, and states positively that he saw the coal boat, and there was no light on her, nor any one on the bank or around there. Adrian Joseph passed along the levee between 11 and 12, and says the same.

Bryant, cabin watchman; Walker, forecastle lookout; Williams, captain of the watch; Max. Blanchard, pilot; Loret, clerk; Gatechair, second mate; P. Blanchard, mate; Arthur Blanchard, engineer; and Mr. Darton, passenger on the St. John,—all state positively that there was no light on the coal boat when they approached her. Several of these were so situated that they must have seen a light if there was one there at first, and all of them were there very soon after the blowing of the whistle and ringing of the backing bell. The witnesses for libelant who testify to a light having been on the boat at first state it was still burning as she floated down the bayou, but Barre, pilot on the Lafourche, the steamer that met and pushed the boat into the bank at Williams' request, says there was no light, and that he said to Williams, "Why is it that you had no light on the barge?" and that

Williams made no answer. Bryant, watchman on the St. John, says that after the collision three men came down to the bank, and one said, "You see what it is not to have a light on your barge." Taking the entire testimony regarding the presence of a light, we are satisfied that the preponderance is greatly in favor of there being none on the boat. There are but six witnesses who testify to the presence of a light, and one of them is satisfactorily shown not to have been present, or known anything about it; while there are twelve, nearly all river men, who are accustomed to look out for lights as a part of their business, and who must necessarily have seen one had there been one, who state there was none.

But finding there was no light only finds that the coal boat was at fault, but there still remains the question whether there may not have been fault on the part of the steamer. Is there any presumption of negligence or lack of ordinary care on her part in not seeing the barge before so near an approach that it was impossible to completely check the headway before striking her? The position taken by claimants that the coal boat was lying out into the stream 75 feet, and was not struck by the steamer, but that she swung against the steamer as she approached, and that the injury was done by the Lafourche, we do not think is borne out by the evidence. It will be seen that, according to the testimony of the witnesses on board the St. John who did not come out on deck until after they heard her backing bell, although that was the position of the barge then, swung out nearly to the middle of the stream, yet as soon as the steamer backed the boat straightened herself by the current so that the steamer could get by. If the boat was straightened by the current, and swung in nearer to the bank as soon as the steamer backed away, there must have been some other force than the current to have thrown her so across the bayou before the steamer's approach. The influence of the steamer which preceded her was one of suction, a drawing of the water towards her, down the stream, and not propulsion or pushing it forward, and could not have had the effect of swinging the barge out into the bayou. We are therefore satisfied that the steamer struck the barge, and threw her partially across the stream, where she was seen by Darton, but that she had so reduced her speed by backing before the striking that the blow was so slight as to cause no shock perceptible to those on board, yet sufficiently severe to break the lower line by which she was made fast, crack or split the planks of the end, producing a small leak, and push her out into the stream where she was. The backing of the steamer permitted her to swing back with the current, carrying away the rotten deadman or buried log, and letting her go adrift. The only two points upon which the steamer could be found in fault would be an undue rate of speed, or an insufficient lookout and neglect to see the barge in time to prevent the collision. The barge was, by the neglect of those in charge of her, unquestionably in fault. Was the steamer so also? The rule is imperative that a steamer shall keep out of the way of a vessel at anchor, but it is none the less imperative that the boat at anchor shall display a light. If she fails in this, and a collision occurs, she must bear the loss,

unless it appears that with due care she could have been seen and avoided. In proving fault in the steamer in either of the points stated, in the absence of a light, the burden of proof is upon the libelant. The evidence upon the question of speed is very meagre. The pilot of the St. John says they were going against the current about four or four and a half miles an hour. The mate seems to be utterly and unreasonably ignorant about the speed they were making, but says they were going under a slow bell. The second mate says they were going under a slow bell, but he couldn't tell what speed they were making; sometimes they did not go three miles per hour. Examining the testimony in regard to the length of time they were between landings and the speed testified to, we fail to find any evidence showing that she was making at the most more than four and a half or five miles an hour, which we do not consider, under the circumstances, an unreasonable rate. She was in an open stream, with very few meeting or passing vessels, and no anticipated obstacles. The same rules that would apply to a crowded harbor do not apply here.

Is the fact that the barge was not seen before, notwithstanding the absence of a light, presumptive evidence of negligence on the part of the officers or crew of the steamer? The night was dark, hazy and drizzly. It had been raining. The barge or coal boat was but about 2 feet above the surface of the water, with no masts, spars, sails, or upper work, or anything light in color which would be easily visible in the dark, and we cannot consider that the fact that it was not seen until it was within a distance of 175 or 180 feet would show lack of care or diligence. It is testified to that the lookout and pilot were attending to their duties, and they had the right to assume that any vessel or boat in the stream would make itself known by a light. The Scotia, 14 Wall. 181. They were naturally and properly on the lookout for lights, and not low, black objects on the surface of the water; and it does not appear that they could with due diligence have discovered it before they did.

It appears that every precaution to avert the disaster was taken as soon as the discovery was made. The backing bell was rung, and the wheel reversed, so that the headway was stopped, and the blow very slight; yet it was sufficient to crack or split the planks, being unsupported as they were by any backing of coal or any other material, and part the rope and swing her from her place. Unquestionably the damage and leak was so slight at first that with reasonable pumping she would have been kept afloat. It was not noticed or seen at all when she was put ashore below, either by those in charge or the officers of the Lafourche. We fail to find any fault in the steamer on account of unreasonable speed or lack of lookout, and consider the absence of a light was the entire cause of the disaster.

It is ordered that the cause be remanded to the court below, with instructions to dismiss the libel, with costs.