THE COLUMBIA.

THE RAVENSCOURT.

THE TYEE.

(Circuit Court of Appeals, Ninth Circuit. May 13, 1901.)

No. 655.

1. TOWAGE—INJURY TO TOW—LIABILITY OF TUG.

A ship which consents to being towed with another vessel to avoid delay, and without any advantage having been taken by the tug, assumes the extra risk of the double tow, and cannot hold the tug liable for an injury she sustains as a result, except on the ground of negligence in the performance of the contract.

2. SAME—BREAKING OF HAWSER—INEFFICIENT STEERING OF TOW.

A tug cannot be charged with fault because of the breaking of a hawser used for towing a ship, which was of sufficient size, made expressly for its use, thoroughly tested, and guarantied to be of a strength greater than was necessary, and had been in use but three months, and which apparently broke because of the improper steering of the tow, which placed it under a sudden and unusual strain.

3. SAME.

A ship in tow cannot hold the tug responsible for her own failure to follow the tug's course where the latter gave the proper signals to indicate changes of course, the duty of proper steering devolving upon the tow; nor does the fact that her sheering from the proper course could have been seen from the tug impose upon the latter the duty of warning her, where there was no danger not as well known to the ship as to the tug.

4. SAME.

A tug had two tows on separate lines of different lengths. The shorter line parted, and the tug at once reversed, and slackened the longer line,

but the tows came into collision. *Held*, that the tug could not be held in fault for its failure to cut the hawser of the rear tow, where its action in reversing accomplished the same result as promptly and effectually.

5. COLLISION—VESSELS IN TOW—NEGLIGENT STEERING.

A ship and a bark were both in tow of a tug on separate lines. The ship was on the shorter hawser, and on the port quarter of the tug. Through inefficient or negligent steering, she failed to follow the course of the tug, but was allowed to sheer to starboard, across the hawser of the bark, and then sheered in the opposite direction, when her hawser parted, and she fell back, coming in collision with the bark, and being still upon or against the latter's hawser, and off her own proper course. *Held*, that the ship, without whose initial fault the collision would not have occurred, was solely liable for all damages, although the bark may have made an improper maneuver in extremis, and after the collision had become inevitable.

6. SAME—DAMAGES FOR DELAY—CHARTER FIXING DEMURRAGE AS EVIDENCE.

In a suit for collision, where the injured vessel was delayed for repairs, the provision of her charter fixing the rate of demurrage is competent evidence of her actual damages by reason of such delay, and, although it may not be conclusive, makes out a prima facie case in the absence of other proof.

7. ADMIRALTY—BOND FOR RELEASE OF VESSEL—DECREE AGAINST SURETY.

Where bond has been given by the claimant of a libeled vessel, under Rev. St. § 941, a final decree, awarding damages in the suit, may be entered against both principal and surety at the time of its rendition.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Metcalfe & Jurey and H. W. Hutton, for appellants.

Struve, Allen, Hughes & McMicken, for appellee Puget Sound Tugboat Company.

L. C. Gilman (Preston, Carr & Gilman, of counsel), for appellee H. Buchanan.

Before ROSS and MORROW, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is a consolidated suit in admiralty to recover damages for injuries to the American ship Columbia and to the British bark Ravenscourt, caused by a collision between the two vessels while they were both being towed to sea by the steam tug Tyee, which was owned and operated by the Puget Sound Tugboat Company. The suit of the Columbia was in rem against both the Ravenscourt and the Tyee. The suit of the Ravenscourt was in rem against the Columbia only. The testimony was all taken before a commissioner. It is in several respects conflicting, and the record contains much irrelevant and immaterial matter. The court, after a full hearing, came to the conclusion that the only negligence or fault which could have caused the accident was "bad steering on the part of the Columbia," and rendered a decree against her for the full amount of damages sustained by the Ravenscourt, to wit, for $7,288.35, and dismissed the suit brought by the Columbia against the Ravenscourt and the Tyee, with costs. 103 Fed. 668.

1. Appellant contends that the court erred in deciding that the master of the Columbia agreed to the towing of his ship in company with the Ravenscourt. The facts in relation to this matter are substantially as follows: The tugboat company, appellee herein, is engaged in the tugboat business on Puget Sound and adjacent waters, and owns and employs in the prosecution of its business several tugs, including the steam tug Tyee. Its custom was to require 48 hours' notice from ship masters or owners of demand for the use of its tugs in towing their vessels to sea. The British bark Ravenscourt had taken in a cargo of wheat, and was lying in the harbor at Tacoma, intending to proceed to sea on its voyage to South Africa. It had given the requisite notice to the tugboat company that it would require the service of one of its tugs to tow it to sea on Monday, January 22, 1900. The American ship Columbia was also at anchor in the port at Tacoma, taking in a cargo of coal for its home port at San Francisco. On January 21, 1900, Capt. Nelson, the master of the Columbia, came to Seattle, and, meeting Capt. Bailey, master of the tug Tyee, went with him to the office of the tugboat company to see Capt. Libby, its manager. Capt. Nelson there informed Capt. Libby that he desired to proceed to sea as soon as he was laden, and was of the opinion that he would be ready by noon on Monday, and would desire a tug. He was advised by Capt. Libby that the only tug available at that time was the Tyee, which was engaged to tow the Ravenscourt, and that, if he were ready to go, the Tyee could tow both of them. Capt. Nelson then stated that he did not think that the Ravenscourt would be ready. Capt. Libby stated that in that case the Tyee could tow the Columbia, and he would send for another tug to take the Ravenscourt when ready. Capt. Nelson left, stating he would notify Capt. Libby in the morning whether he would be ready to proceed to sea on Monday. On Monday morning, January 22d, Capt. Bailey proceeded with the Tyee to Tacoma, under instructions to there await orders. Upon arriving in the harbor at Tacoma, he was handed a telegram from Capt. Libby directing him to tow both the Columbia and Ravenscourt to sea (Capt. Libby having in the meantime received a telegram from Capt. Nelson stating that his ship, the Columbia, would be ready by noon). Capt. Bailey thereupon proceeded alongside of the Columbia, and notified the captain that he would be ready to take his ship at 2 o'clock, and gave a like notice to the Ravenscourt. At 2 o'clock p. m., Capt. Bailey went alongside the Columbia with the Tyee, and proceeded on board of her, where he met Capt. Nelson, and informed him that he was going to tow both the Columbia and the Ravenscourt. Capt. Nelson then stated that he thought he was to have the Tyee alone, whereupon Capt. Bailey informed him that the Ravenscourt had ordered a tug 36 hours ahead of him, and that, if the Columbia wanted to go then, they would have to be towed double. The master of the Columbia thereupon delivered a check to Capt. Bailey for the towage services about to be rendered. The tug Tyee then put her hawser aboard the Columbia, and it was made fast with 115

or 120 fathoms of cable. This was a 12-inch manilla cable 150 fathoms in length, upon which was shackled a 5-inch steel cable 30 fathoms in length, the latter being made fast on board the Columbia. The cable was made especially for the service of the appellee, and was guarantied subject to a government test of more than 116,000 pounds, had been in service only about three months, and had been thoroughly tested by use, and carefully inspected before being made fast to the Columbia. This hawser led from the port quarter of the tug, and passed through the chocks on the starboard bow of the Columbia, so that the Columbia, in towing, could follow the tug, keeping the latter upon her starboard bow. The tug thereupon proceeded with the Columbia to where the Ravenscourt was at anchor, and took the latter in tow, using a hawser of the same size and kind, except that it had been longer in service. This hawser led from the starboard quarter of the tug, and was made fast across the port bow of the Ravenscourt, being about 180 fathoms in length. The Ravenscourt thus followed the tug, keeping the latter on her port bow, and being about 200 feet behind and on the starboard quarter of the Columbia. We are of opinion that the court did not err in holding that the master of the Columbia "consented that the said vessels should be towed together, and voluntarily assumed, in behalf of said vessel, any additional hazard involved in the towing of said Columbia in company with another vessel, and agreed on the part of his vessel that the same should be so towed in company with another vessel." The owners of the Tyee could not be held at fault on the ground that such a double tow might be more hazardous than a single one. There was no misrepresentation or advantage taken by the Tyee. The Ravenscourt had the first call for a tug, and the Columbia was informed that, if she wanted to go at that time, she must take a double tow. If she wanted a single tow, she would have to wait until another tug came in. In order to hold the Tyee liable in this regard, it would have to be shown that it was guilty of negligence in securing or performing the contract. The master of the Columbia had the legal right to enter into a contract in respect to the towage, and, having accepted a double tow with a full knowledge of all the facts, it must be held as consenting to the extra hazard occasioned thereby, if there was any.

The other questions raised by the assignment of errors principally consist of objections urged to the following findings of fact by the court:

"That said ship Columbia was towed on the port side of said tug, and said bark Ravenscourt on the starboard side of said tug. That said tug had sufficient power to tow both said vessels, and it was the common practice on Puget Sound for tugboats to tow two or more vessels together. That the hawser furnished by said tugboat for the towing of said ship Columbia, and used as aforesaid for that purpose, was comparatively new, and had been subjected to a most thorough test, and found sufficient to sustain a strain many times greater than it would have to bear in towing said ship Columbia in the waters of Puget Sound, and said hawser was carefully and thoroughly inspected by the officers and crew of said steam tug Tyee at the time the same was passed out to the Columbia; and said hawser and all equipment

furnished by said tugboat for the towing of said vessels was adequate and sufficient and in every respect suitable for such purpose. That said vessels duly proceeded on their course until after 6 o'clock p. m. of the day aforesaid (January 22, 1900), at which time they had proceeded nearly twenty-five miles, and were off Alki Point on Puget Sound. It was then dark, and raining, with a fresh southerly breeze and an ebb tide; the wind and tide being favorable to the progress of said vessels on their course. At said time and point a bright light was observed off the port bow of the tug, and immediately thereafter one or more other lights were seen, which the master of the tug at first supposed to be the lights of a tug having a tow; and, not being able to make her out exactly, said master blew several blasts of the tug's whistle as a warning to the ships in his wake that he was about to change his course, and for them to follow. At the same time the tug changed her course, going to starboard, and after a few minutes the light ahead was discovered to be a sailboat going in the same general direction. Thereupon the tug made an irregular signal by blowing several blasts of her whistle, and changed back to her regular course. In a few minutes after the tug came back on her course, the Columbia's towline parted, and within a short time thereafter the Ravenscourt came in collision with the Columbia, the stem of the Ravenscourt striking the Columbia's port quarter near her mizzen rigging, causing serious damage to both vessels. That from the time of leaving said port of Tacoma up to the time of said collision the said tugboat. Tyee was in all respects properly navigated, steered, and managed; and during the whole of said time the said bark Ravenscourt was at all times steered so as to follow the course of said tug, to remain well on the starboard side thereof, and to keep clear of the proper course of said ship Columbia. That at the time the said tug changed her course to starboard, as aforesaid, the course of said Ravenscourt was immediately changed to follow the course of said tug, and when the said tug resumed its regular course the course of said bark Ravenscourt was again changed to follow the course of the tug; and the officers and crew of said bark Ravenscourt, at all times after leaving the said port of Tacoma, and up to the time of the collision aforesaid, properly navigated, managed, and steered said bark, and in all respects performed their duties in that behalf, constantly observing the tug ahead of them, and following her, and observing the signals given by said tug, and were not guilty of any negligence, fault, or improper navigation. That the master, officers, and crew of said ship Columbia were negligent in the discharge of their duty, and did not properly navigate or steer said vessel, and did not change the course of said vessel to follow the course of the tug at the time the course was changed, as aforesaid, and did not follow the course of said tug, as it was their duty to do; so that shortly after the changing of said course on the part of said tug, the said Columbia sheered to starboard in such a manner as to cross the towline of the Ravenscourt, and again took a sheer to port, whereupon the towline of said Columbia parted, and the said Columbia fell astern, and came in collision with said bark Ravenscourt, as hereinbefore stated. That said maneuvers of said Columbia and said collision were occasioned wholly by the negligence, carelessness, improper management and navigation of said ship Columbia by her master, officers, and crew, and said Columbia was wholly at fault for said collision, and the said Tyee and Ravenscourt were not, nor was either of them, at fault, or in any way responsible for said collision."

The contention of appellants that the court erred in finding that the Tyee and its owner were without fault is wholly untenable. The great weight of the evidence clearly shows that the hawser furnished by the Tyee to the Columbia, which it is claimed was defective, was comparatively new; that it had been thoroughly tested and subjected to severe strains without disclosing any defects, and that it was examined by the mate and crew of the tug when put on board of the Columbia. It is true that the mate and one of the crew on the Columbia, who assisted in pulling the hawser

in after it broke, testified that they looked at it, and "thought it was pretty shaky." Testimony of this character is wholly insufficient to overcome the evidence contained in the record that the hawser was good, and in sound condition. The presumption that the rope was defective because of the fact that it broke cannot be indulged in. The hawser was strong enough to stand any usual or steady strain. The exhibit filed in this case of the piece of the hawser at the place of parting does not show any defect. It may be said that there is no direct proof as to what caused the rope to break, but the entire testimony discloses the fact that it must have parted on account of the maneuvering of the Columbia, which placed it under a sudden and unusual strain. The Tyee is not shown to have been guilty of any negligence in the use of the hawser.

It is next claimed that the tug was negligent in not having a proper lookout. There is no averment in the libel of the Columbia to the effect that the tug was negligent in not having a proper lookout. This issue was not made in the court below. The libelant never asked to have the pleadings amended in this respect. Under these circumstances we are of opinion that this court ought not to be called upon to discuss the evidence upon this point, unless it is clearly shown that the tug did not have a proper lookout, and that the absence of a lookout was the cause of the collision. It is not so shown. It is, therefore, enough to say that, in our opinion, the testimony contained in the record fully supports the view contended for by the Tyee that the absence of a lookout could not in any manner have contributed to the collision.

It is argued by appellant that, inasmuch as the evidence shows that the master of the Tyee saw the Columbia sheer some six or seven minutes before the collision occurred, the tug was guilty of negligence in not warning the tow, or in not stopping the tug. Numerous authorities are cited in support of this contention. It is undoubtedly true, as was said by the court in The Syracuse, 9 Wall. 672, 675, 19 L. Ed. 783, that "a tug with vessels in tow is in a very different condition from one unincumbered. She is not mistress of her motions. She cannot advance, recede, or turn either way at discretion. She is bound to consult their safety as well as her own. She must see that what clears her of danger does not put them in peril. For many purposes they may be regarded as a part of herself. They have the benefit of her traction, and she the burden of their inertia." The tug did not, however, perform any act inconsistent with its duty as announced in that decision. In The Atlas (D. C.) 12 Fed. 798, the court held that it was the duty of the captain of the tug, when he sees his tow steering directly into danger, to warn her against it. As a matter of fact, the evidence shows, as the court found, that a warning was given by several irregular, short, sharp blasts of the whistle when the tug changed its course. The Columbia was not steering into an unknown danger, as was the case in some of the authorities cited by appellant. Every case must, of course, depend upon its own peculiar facts. The Tyee did not have it within its power to steer either the Colum-

bia or the Ravenscourt. It was the duty of the ship and bark to follow the course of the tug. The duty of proper steering devolved upon the respective vessels, and the tug cannot be held responsible for any fault of the vessels, or either of them, in that regard. It is urged by appellant that it was the duty of the tug to have cut her hawser when she saw impending danger. Where a collision is imminent, and it is apparent that it might be avoided by cutting the hawser of the tow, it would be the duty of the tug so to do. But in the present case it is satisfactorily shown that the collision could not have been avoided by the cutting of the hawser. The testimony of the engineer in charge of the engines of the tug is clear and positive to the effect that immediately upon the parting of the hawser on the Columbia he stopped and reversed the engines, the effect of which necessarily caused the Ravenscourt's hawser to become slack, and virtually accomplished the same result as if the hawser had been cut. After the engines of the tug were reversed, the tug was not propelling the Ravenscourt. If the hawser had been cut, it would not have stopped the motive power any quicker or more effectually than was accomplished by stopping and reversing the engines of the tug.

It is contended that the tug was at fault in not giving more explicit instructions to the respective vessels as to the meaning of its signals. The card of signals furnished to the vessels did not relate to the general navigation of them. It simply furnished certain means of communication with them by the tug. Two whistles were the signal to set the square sails, and four whistles to take in and furl sails. There were also other signals, to be used in foggy weather. As a matter of fact, no sails were set on either of the vessels under tow, and the weather was not foggy. It was raining, but there was no fog. It cannot, therefore, be consistently claimed that any of the officers or of the crew on board of the Columbia were confused or misled by the blasts of the whistles. The whistles of the tug were irregular, and were evidently to attract the attention of the tows to the change of the course made by the tug, and it is not to be presumed that the officers of the Columbia were unacquainted with the whistles given by tugs in approaching other vessels. The evidence, in its entirety, clearly shows that the whistles were correctly understood by the officers of the Ravenscourt, and ought to have been understood by the Columbia. Our conclusion is, after reviewing the evidence, that the Tyee was not in any manner at fault, and cannot be held responsible for the collision.

Did the court err in holding that the Ravenscourt was free from any fault or negligence? Did the court err in holding that the Columbia was wholly at fault? What caused the collision? These questions may be grouped together. It is earnestly argued by appellants that the Ravenscourt was negligent in this: that her helm was put hard a-starboard, instead of hard a-port, just prior to the time of the collision. To determine this question, we must look at the facts as they are presented in the record, and ascertain the conditions by which the bark was surrounded. What were the

circumstances which caused the Ravenscourt to place herself in the position stated? Did the Ravenscourt voluntarily and negligently take the position, or was she compelled, on account of great peril, caused by the position and course of the Columbia, to act as she did for the purpose of endeavoring to avoid the collision which seemed to be inevitable unless such a course was pursued? In the consideration of these questions it must be borne in mind that it was the duty of the vessels that were being towed to look after their own steering, and to follow in the course of the tug. The ship Columbia was towed on the port side of the tug Tyee, the bark Ravenscourt on the starboard side of the tug. The testimony of all the officers and crew on board the Ravenscourt and the Columbia is to the effect that, if both of these vessels had maintained proper lookouts, and each had been properly steered, no collision would have occurred. Which of the vessels was, then, in fault? The evidence shows that the Columbia did not follow the course of the tug; but, on the contrary, it "sheered to starboard in such a manner as to cross the towline of the Ravenscourt, and again took a sheer to port, whereupon the towline of said Columbia parted," and the Columbia fell astern, and came in collision with the Ravenscourt. An examination of the testimony shows that the master of the Columbia, although he heard the hawser of the Ravenscourt scrape against the side of his vessel, which of itself was enough to inform him that one or the other vessel was out of its regular course, remained in the cabin, and did not go on deck until he heard the scraping the second time. The mate of the Columbia did not get on deck until the collision actually occurred. In contrast with this action of the officers of the Columbia, the record shows that when the second officer of the Ravenscourt, who was in charge of the deck, heard the signals of the tug, he immediately called the master, who at once went on deck, and took charge of his vessel, and kept charge thereof until the collision occurred. It is evident from the testimony of all the witnesses, notwithstanding the conflict upon some of the points, that, if the Columbia had maintained its proper position, and discharged its duty by following the course of the tug, its hawser would not have parted, and there would not have been any collision. Even if the hawser had broken, she would have drifted clear of the Ravenscourt. The original fault was committed by the Columbia, and, but for such fault, there would not have been any collision. This is the gist of the whole controversy. It is the simple thread of truth that unravels all the doubts and difficulties that might otherwise exist in this case as to the course pursued by the Tyee and Ravenscourt. "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel." The City of New York, 147 U. S. 72, 85, 13 Sup. Ct. 211, 37 L. Ed. 84, 85; The Ludvig Holberg, 157 U. S. 60, 70, 15 Sup. Ct. 477, 39 L. Ed. 620; The Oregon, 158 U. S. 186, 197, 15 Sup. Ct. 804, 39 L. Ed. 943; The Umbria, 166 U. S. 404,

409, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Victory and The Plymothian, 168 U. S. 410, 423, 18 Sup. Ct. 149, 42 L. Ed. 519. As was said by the court in The John L. Hasbrouck, 93 U. S. 405, 26 L. Ed. 962:

"The rules of navigation are ordained, and required to be observed, to save life and property employed in marine pursuits, and not to promote collisions, or to justify the wrongdoer when such a disaster has occurred. The Sunnyside, 91 U. S. 210, 23 L. Ed. 302. Ships and vessels engaged in commerce ought to observe the rules of navigation in all cases where they apply; and it is safe to affirm that they always apply when there is impending risk of collision, except in special cases, where their observance would tend to promote what they were ordained to prevent, or where special circumstances render a departure from them indispensably necessary to avoid immediate danger."

It was in the dusk of the evening when the collision occurred. The time between the first signal of the tug and the collision was very short. There was but little time for consideration. The master of the Ravenscourt saw the Columbia coming towards him broadside on, with the hawser fouled in the stern of the Columbia. Unless something was immediately done, the two vessels would be pulled together by the hawser. If he had ported his helm, and attempted to go astern the Columbia, the vessels were bound to collide. It was under these circumstances of great peril that the master of the Ravenscourt attempted to put his bark on a parallel course with that of the Columbia. The evidence tends very strongly to show that the collision could not have been avoided at the time the helm of the Ravenscourt was put hard a-starboard by any course of management on the part of the bark. The Ravenscourt, previous to the peril in which she was placed by the maneuvers of the Columbia, was not guilty of any fault whatever. She was pursuing the course of the tug, as it was her duty to do. From a position of apparent safety, she was, on account of the extraordinary maneuvering on the part of the Columbia, put in great peril. A collision then seemed inevitable. The question of negligence, therefore, does not depend upon whether the Ravenscourt, in this sudden emergency, pursued the best possible course to avoid the danger. It is certain that her conduct at that time neither caused nor aggravated the collision, and that, in the light of all the facts, she should not be held guilty of any negligence. Of course, it was the duty of the Ravenscourt, when she was placed in great peril by the movements of the Columbia without any fault on her own part, to avoid the collision if she could; but, when a vessel is placed in a perilous position through the fault of another vessel, she is not to be held to strict rules of navigation. In such cases a mistake made in the agony of almost certain collision is regarded as an error for which the vessel that caused the peril should alone be held responsible. In The Nichols, 7 Wall. 656, 666, 19 L. Ed. 157, Mr. Justice Clifford, in delivering the opinion of the court, said:

"Remaining proposition of the appellant is that the bark is also in fault, because her helm, just before the collision occurred, was put to starboard. But it is clear that the error, if it was one in that emergency, was produced by the impending peril, which is justly chargeable to those having the control and management of the other vessel. Mistakes committed in such mo-

ments of peril and excitement, when produced by the mismanagement of those in charge of the other vessel, are not of a character to relieve the vessel causing the collision from the payment of full damages to the injured vessel."

In The Carroll, 8 Wall. 302, 306, 19 L. Ed. 392, the court said:

"The safeguards against danger, in order to be effectual, must be seasonably employed, and in this case they were not used until the danger was threatening. If there was fault on the part of the schooner, the steamer committed a far greater fault in suffering the vessels to get in such dangerous proximity at the moment preceding the collision; and, as she has furnished no excuse for this misconduct, is chargeable with all the damages resulting from this collision."

To the same effect, see: The City of Paris, 9 Wall. 634, 638, 19 L. Ed. 751; The Falcon, 19 Wall. 75, 78, 22 L. Ed. 98; The Sea Gull, 23 Wall. 165, 181, 23 L. Ed. 90; The Blue Jacket, 144 U. S. 371, 391, 12 Sup. Ct. 711, 36 L. Ed. 469; The E. A. Packer (C. C.) 49 Fed. 92, 99; The Mexico (D. C.) 78 Fed. 653, 656.

The collision was directly attributable to the fact, clearly proven, that the Columbia was improperly and negligently steered. All of the witnesses on board the Ravenscourt and the tug who were in a position to witness the steering of the respective vessels testified that just prior to the collision the Ravenscourt was at her proper place, following the course of the tug, and that the Columbia steered first to starboard, and then to port. The testimony of these witnesses was fully corroborated by several of the officers and crew of the Columbia.

Fred Williams, who was a seaman on board the Columbia, testified that it was his lookout, and that he was on the forecastle head when the collision occurred; that he heard the whistles "four toots quick"; that shortly thereafter he heard two whistles again.

John Jamieson, who was a sailor on the Columbia, and called as a witness on her behalf, upon cross-examination testified as follows:

"Q. Now, just a little bit before the collision, you heard the tug whistle four short, sharp blasts? A. Yes, sir. Q. And just before that, did you notice the ship sheer off to starboard? A. Yes. I noticed she took a sheer to starboard. Q. She took a big sheer to starboard? A. Yes, sir; she took a sheer to starboard. Q. Then, right after that, you heard the tug blow these sharp whistles? A. Yes, sir. Q. Then did you see her take a big sheer back to port? A. Yes, sir; she swung back to port. Q. Then, as she swung back to port, you saw the sparks of fire coming out of the wire? A. Yes, sir; the hawser carried away then." And on his re-examination he testified: "Q. Where was the Ravenscourt when the Columbia took the sheer to starboard, —in what place was she? A. She was about astern. Well, when we took a sheer to starboard, we were apt to get across his hawser, you know,—to get on top of his hawser. Q. Was she off to the port quarter or right in your wake, as far as you know? A. I seen, when we took the sheer back, she was going on the port quarter, sir. We took a sheer back to port, and, of course, we were diagonally right across his hawser. Q. Was his hawser then around your stern? A. No, it was underneath her bottom. We were on top of it. Q. What caused the sheer to starboard? Was it the fact that she had her hawser around you? A. I could not tell you that. Bad steering on account of us, I believe. Q. That she had steered into you? A. No, bad steering of us. When we took a sheer to starboard, the English ship is not steering us, sir. We got to steer ourselves. * * * Q. When you saw her steered to starboard, you kind of put it up that the Columbia was steering

badly? A. That is what I did, sir. Q. But you did not know what caused it? A. The fact is, I knew it, sir, because I seen it. Q. You saw what? A. I seen the steering bad."

Patrick Ryan, who was steering the Columbia, when called upon as a witness on her behalf, testified upon cross-examination as follows:

"Q. Your directions were to follow the tug? A. Yes, sir. Q. Keep her on your starboard bow? A. Yes, sir. Q. Did you see the tug change her course just before the collision? A. I did; yes, sir. Q. How many times did she change it? A. Well, that was the only time, during my spell at the wheel, that she changed it; just that time. Q. In what way did she change her course,—in what direction? A. She changed it to starboard. Q. Did she afterwards come back to her original course? A. No sir; not after the collision. Q. Then, she was still on this changed course to starboard at the time of the collision, was she? A. Understand what I mean by starboard, sir. She crossed over from our starboard bow over to the port bow, you see. Q. Her change was to port? A. Her change was to port, and I had to starboard the helm to try to meet her. Q. That is the only change you saw,— that one change? A. That was the only change, and that happened just a little while after she blowed her whistle. Q. Let me see if I do understand you. You say you saw the tug change to go to port. Is that right? A. Coming to my port, and I would have to starboard to meet her. When the tugboat shifted her course, I had her almost on a straight hawser. I had the tugboat here (showing), and now he changed his course, and came right over here (showing), and here we are. He comes over here, and I starboard my helm, and then before that he blows four whistles. Q. Now, was the change of course to starboard or to port? A. To port. Q. That is what I want to get at. A. I would have to starboard the helm to meet that. Q. And that was the only change you observed? A. Yes, sir. Q. No other change was reported by the lookout or the officer of the deck to you? A. No."

James B. Wilson, the first mate of the Columbia, was called as a witness on her behalf, and upon cross-examination testified as follows:

"Q. Now, the two vessels, the Columbia and the Ravenscourt, if they had been properly steered, and kept proper lookouts, they would have no difficulty in following the tug, would they? A. There would not have been any need for a collision if they had been kept in the proper position as they ought to. Q. The duty devolved entirely on the vessels in tow to do their own steering, —to take care of their course. * * *? A. Each one is supposed to steer right after his light, to keep him at a certain point on our bow. Each vessel is supposed to be kept there, and not to run across one another. Q. They are required to follow the tug? A. Yes, sir. * * * Q. Every time the tug had occasion to change its course, it would be the duty of each of these vessels— A. To follow it. Q. To follow the tug? A. Yes. * * * Q. Now, in that case, if the tug went to port, and the Ravenscourt, which was aft of you, and following the tug, and you did not, but continued on your course, you would cross the hawser of the Ravenscourt, would you not? A. I would in that case, sure. Q. That is what I mean. If the tug should right her course again, and you did not promptly right your course, in that event you would be thrown on the starboard side of the Ravenscourt, would you not? A. Yes, we would."

The court's finding upon the point that the collision was caused solely by the bad steering on the part of the Columbia is fully sustained by the evidence.

It is claimed that the damages allowed are excessive. The amount of damages which the Ravenscourt suffered for repairs was stipu-

lated to be $4,088.35. To this the court added demurrage at the rate of $100 per day for a period of 32 days, making the total amount $7,288.35. The original contention of appellants was that there was no evidence to show how many days the Ravenscourt was detained, and that the court erred in allowing any damages for the demurrage. Before the submission of the case, however, counsel for appellants withdrew this claim, stating that he had, by inadvertence, overlooked the fact of the written stipulation "that both said ship Columbia and Ravenscourt were detained 32 days by reason of said collision"; but still urged the objection, that the court erred in allowing $100 per day for the time the ship was detained. The record shows that counsel for the Ravenscourt stated "the substance of the charter party, so that it may appear in the record." This charter party provided in behalf of both parties for every day's detention as demurrage "there shall be paid three pence per registered ton, or its equivalent, per day, day by day." Counsel for the Tyee then said: "It is agreed that the foregoing statement may be considered and taken with the same force and effect as though the original document were introduced in evidence." Counsel for the Columbia said: "I object, as incompetent, irrelevant, and impertinent, and not responsive to any of the issues in this case." In addition to the terms of the charter party, the captain of the Ravenscourt testified, without objection, that it cost him $20 per day to board his crew while the vessel was being repaired. The registered tonnage of the Ravenscourt was shown to be 1.373 tons, and demurrage at the rate of 3 pence per ton would be $82.38 per day. The court added the expense of boarding the crew and allowed damages in the sum of $100 per day. It is claimed that the court erred in allowing these damages. The contention is that the Columbia is not bound by the provisions of the charter party; that the three pence per ton per day is only allowed as a penalty, and that, independent of any provisions contained in the charter, the Ravenscourt was bound to prove her actual or net loss. In other words, that the provisions of the charter party are not competent evidence to prove the measure of damages. The general rule in collision cases is that the measure of damages is the actual loss suffered, and that the actual loss must be proved by legal and competent testimony. The Baltimore, 8 Wall. 377, 19 L. Ed. 463; The Potomac, 105 U. S. 630, 26 L. Ed. 1194; 9 Am. & Eng. Enc. Law (2d Ed.) 261, and authorities there cited. But the question whether the provisions of the charter party are admissible in evidence to prove the damages is only discussed, in so far as our attention has been called, in a few cases, and they are conflicting. The Jas. A. Dumont (D. C.) 34 Fed. 428, supports the views contended for by appellant. Brown, J., in the opinion, said:

"The stipulations of a charter as to the rate of demurrage is not, I think, competent legal evidence in favor of the owner, in an action brought by him against third persons for damages by collision."

In Orhanovich v. The America (C. C.) 4 Fed. 337, 342, the opposite rule is expressed. The commissioner to whom the matter was re-

ferred assessed the damages upon the basis of the demurrage stipulated for in the charter party. It was there contended that the claim was allowed upon improper evidence. The court, among other things, said:

"But why may not a rate of demurrage, fixed by the vessel's charter, and established by the rules of the maritime exchange, and which, therefore, would have been conceded to her if delayed by her charterer, be taken as a measure of fair compensation for a similar loss caused by the act of a wrongdoer?"

In The Silica v. The Lord Warden (C. C.) 30 Fed. 845, the commissioner appointed to ascertain the damage suffered by the delay allowed demurrage at the rate of $92 a day, the amount stipulated in the Silica's charter party, for time lost while undergoing repairs. To this counsel for the Protector excepted on the ground that the Silica was not entitled to more than the actual damage suffered. The court said:

"The exceptions must be dismissed. The rule adopted by the commissioner for ascertaining damages from delay is, under the circumstances, the proper one."

Taking the facts of this case into consideration, we are of opinion that the evidence as to the provisions of the charter party was competent to be admitted. Conceding that it may not be conclusive in all cases, it nevertheless makes out a prima facie case, which, in the absence of any proof to the contrary, justifies the rendition of a decree in accordance therewith. The court did not err in allowing the damages.

Objection is made to the entry of a decree against the surety Boole at the same time that it was entered against the claimant. This objection cannot be sustained. The bond was given under the provisions of section 941, Rev. St., which provides as follows:

"Such bond or stipulation shall be returned to the court, and judgment thereon, against both the principal and sureties, may be recovered at the time of rendering the decree in the original cause."

In The Belgenland, 108 U. S. 153, 2 Sup. Ct. 864, 27 L. Ed. 685, it was held that the final decree in such cases may be entered against both principal and sureties at the time of its rendition. The decree of the district court is affirmed, with costs.