**THE PROSPECT.**

**THE CARNESEE.**

**No. 2131.**

District Court, W. D. New York.
March 31, 1944.

See also 2 F.R.D. 519.

Alexander & Ash, of New York City, and Stanley & Otten, of Buffalo, N. Y., (Edward Ash, of New York City, and Arthur E. Otten, of Buffalo, N. Y., of counsel), for Tug "Prospect".

Brown, Ely & Richards, of Buffalo, N. Y. (Laurence E. Coffey, of Buffalo, N. Y., of counsel), for libellant and cross-respondents.

KNIGHT, District Judge.

On the early morning of October 18, 1941, the Tug "Prospect" collided with a three-in-one unit of the libellant, Cargo Carriers, Inc. This unit consisted of the Diesel tug "Carnesee" and three barge sections, tug and barges totalling 298 feet in length. The collision occurred at the New York State Barge Canal terminal at the foot of Genesee Street in the City of Buffalo. The terminal has two piers, and the collision occurred on the northerly side of the northerly pier. The preceding night the "Carnesee" took on water at the end of the northerly pier and with its tugs then moved to the northerly side of the pier where it tied up for the night. The tug "Prospect" also took on water at this pier, and then moved around the three-in-one unit to a point in the basin near the bulkhead where it also tied up. The three-in-one unit (hereinafter called "Carnesee") made fast with its stern lines to the pier near its northerly end, and its bow lay across the bow of the so-called Jordan fleet, consisting of four barges and a tug. The Jordan also was made fast with its stern lines to the pier. The Jordan barges were connected with the tug, two ahead and two astern. There were two other barges lying at the pier on the bulkhead side of the Jordan barges. The outside of the outer one of these was about 50 feet from the pier. The "Carnesee" continued moored as stated until the Jordan fleet pulled out early in the morning. In order for the Jordan so to do it was necessary for it to free itself from the "Carnesee" by moving the forward end of the "Carnesee". In the position in which the "Carnesee" had been moored it angled from the pier slightly to the starboard, and when the "Carnesee" bow was pushed over by the tug "Olson" of the Jordan fleet, it then was in a position substantially at a right angle to the pier. The "Carnesee" was then not in a position to interfere with navigation in the basin. After the Jordan fleet had pulled out, the tug "Prospect" moved from its location at the bulkhead, where it had been lying during the night, across the forward end of the two barges lying inside of where the Jordan fleet had been moored out around the northerly end of these last-mentioned barges and proceeded about 100 feet where it collided with the "Carnesee" unit, striking it about midship of the barge C.C.I. No. 72 or at a point about 148 feet out from the pier. The tug "Prospect", when rounding the two last-mentioned barges, was moving at a speed of four miles per hour.

The "Carnesee" unit was laden with about 133,000 bushels of grain, had a depth of 15 feet and was drawing 9 feet. The top of the pilot house of the "Prospect" was about 13 feet above the water line, and this put the eyes of the pilot between 10 and 11 feet above such line. The New York State breakwater about 400 feet off the end of the northerly pier marks the west boundary of the Erie Basin. The foregoing is a statement of facts not in dispute.

This collision occurred before daylight and at about 5 o'clock in the morning. The pilot of the "Prospect" testified that as he proceeded from the bulkhead he threw his search light "northerly so that it was showing up the outside of the outermost boat (barge) 50 feet off from the pier," and that he "Must have had the light that way (toward the 'Carnesee'), but I did not see her" and that he "must have had the light shining toward the 'Carnesee'." He also testified that this search light would light up a quarter of a mile away. The "Prospect" pilot knew or had reason to believe that the "Carnesee" unit was lying in the basin.

The weight of the evidence shows that the "Carnesee" unit had lights at both the forward and rear ends on the port side. There is some conflict as to the location and the nature of the lights and also as to whether there was one at the stern end. The pilot of the "Prospect" testified that there was a light offshore by a corner. The captain of the tug "Olsen" testified

that he did see a light when he had gotten his tow clear, and he had theretofore made a statement that "The regular anchor lights were lighted aboard 'Carswego' (meaning 'Carnesee') at the time we pulled out." The captain, engineer, mate and deck hand of the "Carnesee" unit testified that the unit was carrying kerosene lanterns at both ends of the off-shore side suspended on hooks on standards extending above the deck 10 to 12 inches.

■ The respondent, as a defense, claims that the "Carnesee" was not sufficiently and properly lighted. The Rules for Navigation on the Great Lakes and their connecting and tributary waters, 33 U.S.C.A. §§ 258, 259, Rule 9 and 10; 15 C.J.S., Collision, p. 95, § 95 and a number of cases are cited in support of this contention. It is believed that the aforesaid rules are not applicable here and that above cases do not support this view. It said in 15 C.J.S., Collision, p. 95, § 95, supra, that these rules (Navigation) do not apply to moored vessels. In the St. John, 5 Cir., 54 F. 1015, 1020, among other things the Court said: "The same rules * * * (Navigation) do not apply here." The Alabama, D.C., 26 F. 866, involved a case where the derrick was in a place where a boat was not expected to be. In Industry, D.C., 27 F. 767, the bowsprit of a sloop projected partly across the mouth of a creek and her boom swung into the river. The tug was going into the creek.

There are many decisions contrary to the view taken by the respondent. The Bridgeport, 14 Wall. 116, 81 U.S. 116, 20 L.Ed. 787; L'Hommedieu v. The Mischief, D.C., 39 F. 510; Carfloat L. V. 2003, 1925 A. M. C. 689; and Sargent Barge Line, Inc. v. Tug Auburn, 1942 A. M. C. 737.

■ The "Carnesee" was moored in a basin off the main channel. It was in a basin which was entirely off the main channel, but there was sufficient passage way to permit vessels to pass up and down between it and the breakwater distant nearly 400 feet and also to allow vessels to move in and out from the basin. Irrespective of the question of whether it was necessary to provide lights on the starboard side, the weight of the evidence shows that there were the two lights on the port side. The "Carnesee" was moored as directed to be moored. It was sufficiently and properly lighted. But whether so or not, it is entitled to recover here because the col-

lision resulted wholly through the fault of the "Prospect."

It is a fair conclusion from the evidence that the "Prospect" knew the location of the "Carnesee" the preceding night. It had moved around past it into the bulkhead. Under the facts shown it is reasonable to believe that it knew the "Carnesee" had tied up in that general location during the night. It is important to remember that all the movements in question were in a busy basin and movements therein required the careful and cautious operation of tugs and other vessels moving therein.

The pilot of the "Prospect" saw the Jordan pull out. He was then standing in his pilot house. When he began to move out he threw his search lights along the pier but not out toward the forward end of the "Carnesee". As a matter of fact, as appears from the maps, even before the "Prospect" pulled out, the forward end of the "Carnesee" would have been visible from the "Prospect" with the use of search lights. The "Prospect" proceeded out rounding the intervening barges. The pilot claimed he saw some dark object which he took to be the breakwater which was 400 feet from the pier. This seems improbable as he was only about 100 feet from the "Carnesee". The "Prospect" proceeded at a rate of approximately four miles an hour. Whether this was an excessive speed must be determined from the location in which the "Prospect" was moving and the conditions surrounding it. If we say the "Prospect" was not proceeding at excessive speed, as claimed by the libellant, even before it rounded intervening barges by the use of its search lights it would have been able to see the "Carnesee" and to have moved around its forward end without danger. The forward light on the "Carnesee" was seen from the tug Olsen at a distance of 250 feet. The pilot of the "Prospect" himself testified to seeing this forward light after the collision. It would seem from the position of the pilot of the "Prospect" that with reasonable care and caution he could have seen this light. The "Carnesee" extended 298 feet out from the pier, and no other conclusion can be drawn than that the resulting collision occurred with reckless and negligent operation of the "Prospect" and that alone. The following cases are pertinent here: The Granite State, 3 Wall. 310, 70 U.S. 313, 18 L.Ed. 179; City of Paris, 9 Wall.

634, 76 U.S. 634, 637, 19 L.Ed. 751; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Dahlmer v. Bay State Dredging & Contracting Co. (The Orion), 1 Cir., 26 F.2d 603; The Perseverance, 2 Cir., 63 F.2d 788; The Strathleven, 4 Cir., 213 F. 975, 976.

Libellant is entitled to a decree adjudging the "Prospect" solely at fault and liable for the damages suffered, with interest and costs.

Reference to a special master to report as to the damages resulting will be made.

Submit findings to accord herewith.