ORHANOVICH, Master of the Bark Rebecca, *v.* THE STEAM-TUG AMERICA.[*]

*(Circuit Court, E. D. Pennsylvania. October 28, 1880.)*

1. ADMIRALTY—COLLISION—TOWING—ORDER IN WHICH VESSELS SHOULD BE TOWED.—A tug held responsible for damages by a collision between two vessels in tow while passing through a narrow, shallow channel, where it appeared that one of the vessels was known to be a bad steering vessel, and had been placed by the master of the tug behind the other vessel.

2. SAME—CONTRIBUTORY NEGLIGENCE—ORDER GIVEN AT MOMENT OF IMMINENT PERIL.—The injured vessel *held* not to be liable for an order given at a moment of imminent peril, caused by the bad steering of the other vessel.

3. SAME—DAMAGE—BILLS FOR REPAIRS—WHEN PRIMA FACIE EVIDENCE.—Upon the question of the amount of repairs necessitated by a collision, the testimony of the master as to the aggregate cost of the repairs, and the testimony of the vessel's agent as to the payment of the bills, together with the production of the bills receipted, constitute *prima facie* evidence of the amount of damage, without calling the men who did the work.

4. SAME—LOSS BY DETENTION—RATE OF DEMURRAGE—WHEN PRIMA FACIE EVIDENCE.—Upon the question of damages by detention while undergoing repairs, the rate of demurrage fixed by the vessel's charter-party, accompanied by evidence that it is the rate adopted by the maritime exchange of the port, is *prima facie* evidence of the amount of loss.

Appeal from the decree of the district court, in admiralty.

[*]Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

Libel by the master of the bark Rebecca against the steam-tug America, for damages caused by collision with another bark while both vessels were being towed to sea by the tug. The facts in regard to the collision are fully set forth in the opinion of the court. The district court decided in favor of libellant, (see report of case, 36 Legal Intel. 279,) and referred the case to a commissioner (Wayne MacVeagh, Esq.,) to ascertain the amount of the damage. Before the commissioner the master testified as to the aggregate cost of the repairs. The agent of the owners then testified that he paid the various bills for repairs, making up that aggregate, which bills, approved by the master and properly receipted, he produced. He admitted, however, that he had no personal knowledge that the repairs had been made. The persons who did the work were not called. The respondent declined to take any testimony on this subject until the libellant had offered better evidence, and asked the commissioner to report that the evidence offered was insufficient. The commissioner reported that the evidence was *prima facie* sufficient, (citing Coote on Adm. Pr. 96,) and allowed the amount claimed.

With regard to the damages caused by the vessel's detention, it appeared that the rate of demurrage fixed by her charter-party was £15. It was proved that this was the rate adopted in charter-parties used by the maritime exchange of Philadelphia. The commissioner (citing Coote on Adm. Pr. 87) held that this was *prima facie* evidence of the loss, and, there being no evidence to show that it was unreasonable, adopted it as the measure of damages. The district court confirmed the report of the commissioner, and entered a decree for libellant in accordance therewith. See report of case in 8 Weekly Notes, 328. Respondent took this appeal.

*J. Warren Coulston,* for appellant.

*Henry G. Ward* and *Henry Flanders,* for appellee.

McKENNAN, C. J. The master of the steam-tug America contracted with the master of the bark Rebecca to tow her to Bombay Hook, or to sea, from the port of Philadelphia, with the understanding that an additional smaller vessel might be taken in the tow.

On the first of December, 1877, the America took the Rebecca in tow and proceeded down the Schuylkill, and at the mouth of that river took also in tow the bark Dudman, which was of two feet less draught than the Rebecca, but of wider beam. The tow was made up by placing the Rebecca next to the tug, and the Dudman in the rear of the Rebecca, to which she was attached by a hawser. This arrangement of the tow was made against the objection of the master of the Rebecca, who desired his vessel to be placed in the rear. The Dudman was known to the master of the tug to be a bad-steering vessel, and in going down the Delaware river she steered wildly, sheering from side to side. When the vessels approached the channel buoy, at the bight of Newcastle, where the Delaware river is narrowest, the pilot of the Rebecca put her helm hard a-port, in order to bring her in line with the government range lights, and pass in mid-channel, just to the eastward of the buoy, the tug pursuing her course unchanged, keeping on the port bow of the Rebecca, eastward of the channel. Just at this time the Dudman, having taken a sheer to the westward, drew the Rebecca out of her proper course, throwing her head to the eastward, so that, with the helm hard a-port, she kept going to port, instead of starboard, until she grounded on Goose island bar. When the Rebecca went aground the Dudman's sheer to the westward was broken, and she pulled around to the eastward again. At this time the pilot of the Rebecca hailed the Dudman to put her helm hard a-starboard, and immediately thereafter she struck the Rebecca in the port center, causing the injury complained of.

It is obvious that the collision was the result of two causes —*First*, the very bad steering qualities of the Dudman; and, *second*, the arrangement of the tow with the Dudman in the rear. If, by her ready obedience to her helm, she had been under the control of her pilot, or she had been placed ahead instead of behind the Rebecca, the collision would not have occurred. The master of the tug well knew that the Dudman steered badly, and this was made manifest in the passage down the Delaware, and he ordered the relative positions of the vessels in the tow. Was the collision, then, avoidable by

the exercise of reasonable skill and care on the part of the master of the tug? This question is clearly and concisely answered by the district judge in his opinion, which I adopt:

"Was there carelessness in taking the Dudman along? If, as alleged, her steering qualities were so bad as to render her virtually unmanageable in the river, and the respondent was aware of this, there was. That she was a bad steerer—indeed, very bad—is abundantly shown. The witnesses agree respecting it. The master of the tug says she 'steered badly; sheered all over the river going down, first on one quarter and then on the other of the Rebecca;' and the mate of the tug says she 'steered wildly going down the river.' Captain Wilkins, called by the respondent, says she steered so badly that it required two boats to take her down the Schuylkill; and when the respondent met and took her in tow on this occasion she was being thus conducted by the joint efforts of two tugs. That the respondent was aware of her peculiarity in this respect is equally clear. He had towed her before, and knew she steered badly; he so testifies. It does not appear that he ever towed her in company with another vessel before this occasion, or attempted to do so; and, if he had been without such previous knowledge, what he observed in passing down the river should have warned him of the danger of taking such a tow through the narrow, shallow channel near Newcastle.

"And while a proper regard for the libellant's safety forbade taking the Dudman along, in my judgment it especially forbade taking her *astern of the libellant's vessel.* Without considering the order in which two vessels of unequal draft, with proper steering capacity, should be placed in a tow, (about which decided opinions were expressed by the court in *The Morton,* 1 Brown, Adm. 139; *The Zouave,* Id. 110; and *The Sweepstakes,* Id. 509; though practical seamen, as the evidence here shows, seem to disagree respecting it,) I feel no hesitation in saying that to place this unmanageable craft behind, in passing through a narrow, shallow channel, was calculated to produce disaster. The width in the bight, at places, does not exceed 70 yards, and the depth, with the tide as it was

at the time of the accident, is 22 feet. The draught of the Rebecca is 20½ feet. As obedient to her wheel as she is shown to be, she would respond very tardily when within a foot and a half of the bottom, and find some difficulty in controlling her course. With the Dudman wildly tugging at her stern she would be helpless, very likely to ground, and be run into by her unwieldly companion. And this is precisely what occurred."

This is enough to show that the master of the tug did not exercise that degree of good judgment and forethought which a careful discharge of his duty, under the circumstances, demanded, and that to his dereliction in this regard the loss complained of is ascribable.

Nor am I able to affirm the contention of the respondent that the Rebecca responsibly contributed to the collision by the order or request communicated by her pilot to the Dudman, just before the vessels came in contact, to put the helm of the latter hard a-starboard. Under all the circumstances, the effect of such a maneuver was, at least, problematical,— the opinion of the witnesses as to this decidedly differs,—but it is sufficient to say that, even if it was a mistake, no fault can be imputed to the Rebecca, because it was given at a moment of imminent peril, caused by the misconduct of the Dudman.

There ought, then, to be a decree in favor of the libellant; but for what sum? The commissioner, to whom the ascertainment of the damages was referred by the district court, reported the sum expended for repairs to the Rebecca, and the damages resulting from the loss of her use, upon the basis of the demurrage stipulated for in her charter-party, and for these sums, with other proper allowances, the decree of the district court was made.

But it is contended that these claims were allowed upon insufficient or improper evidence. Payments were made to persons who rendered bills for repairs made upon the Rebecca, which were certified by the master, who superintended the work, by the agent of the libellant. This was primary proof of the expenditure, of its purpose and its necessity, and,

unless answered by counter proof, was altogether sufficient to justify the allowance of such payments.

So, also, as to the damages for detention of the vessel. Demurrage, as such, is not claimable; but why may not a rate of demurrage, fixed by the vessel's charter and established by the rules of the maritime exchange, and which, therefore, would have been conceded to her if delayed by her charterer, be taken as a measure of fair compensation for a similar loss caused by the act of a wrong-doer? I think the commissioner rightly received the evidence, and that it justified his conclusion from it.

There must be, therefore, a decree in favor of the libellant, and against the respondent and his stipulator, for $1,973.04, with interest from December 15, 1877, to this date, and costs.