SOCIÉTÉ DES VOILIERS FRANÇAIS v. OREGON R. & NAV. CO.

(District Court, D. Oregon. March 21, 1910.)

No. 4,988.

1. TOWAGE (§ 11*)—RELATION AND DUTIES OF TUG TO TOW.

A tug which undertakes to tow a vessel, at the time without propelling power of its own, assumes responsibility for the direction and navigation of the tow, and is bound to exercise ordinary diligence, skill, and care to carry the tow safely to its destination, taking into account the attendant circumstances and condition. If the work undertaken is difficult and perilous, the diligence and skill required are correspondingly great, and must at all times be commensurate with the danger involved.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**2. TOWAGE (§ 11*)—INJURY TO TOW—NEGLIGENCE OF TUG.**

The master of a tug which, with the assistance of another tug as a helper, undertook to tow a loaded bark from her dock at Portland to an anchorage up the stream, which was at flood, on meeting a large mass of drift attempted to pass through it with the rudders of both the bark and one of the tugs up the stream, and in doing so the rudder of the tug became fouled by the drift and he lost control of the tow, the bark being carried by the current against a dredge on the opposite side of the river and injured. *Held*, that the master did not exercise the proper skill and care required in navigating the tow, and that the tug was liable for the injury, it appearing that he could have turned downstream on seeing the drift, and at least have avoided other vessels.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

**3. COLLISION (§ 125*)—DAMAGES—INJURY TO VESSEL.**

Evidence considered as to the extent of damages to a vessel by a collision at Portland, Or., which was there surveyed, but not repaired, until she reached Liverpool, where she was again surveyed, the report of the surveyors at Liverpool placing the damages much higher than that at Portland before the voyage, and the cost of the repairs also being greater, but admittedly including general repairs.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 279; Dec. Dig. § 125.*]

**4. COLLISION (§ 125*)—DAMAGES—DETENTION OF VESSEL.**

The stipulated rate of demurrage in a vessel's charter is sufficient prima facie to establish the measure of damages for her detention through collision, but where her earning capacity can be otherwise ascertained, it is the safer and better measure.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 279; Dec. Dig. § 125.*]

In Admiralty. Suit by the Société des Voiliers Français, owner of the French bark Marthe Roux, against the Oregon Railroad & Navigation Company. Decree for libelant.

W. C. Bristol, for libelant.

W. W. Cotton, Arthur C. Spencer, James G. Wilson, and Ralph E. Moody, for respondent.

WOLVERTON, District Judge. The French bark Marthe Roux, being loaded and ready for the sea, was on December 21, 1906, moored at Montgomery Dock No. 2, her bowsprit downstream. Previous to her departure it was desired that she should be taken to anchor instream, and the respondent was employed to make the removal. Capt. Pearson was placed in charge of the work. He utilized two tugs for the purpose—the Oklahoma and the Henderson. The Oklahoma, with bow downstream, was made fast to the port quarter, and the Henderson, with bow upstream, to the port bow of the Marthe Roux. The river was at freshet at the time, and some drift was observed to be running. Owing to this condition of the water, although the Marthe Roux was of the smaller type of vessels, being about 1,600 tons net register, it was deemed expedient to use two tugs for the service. Pearson's purpose was to take the vessel to anchor a short distance upstream, and in doing this he designed to navigate her diagonally across the stream to a point near where the Albina ferry lands on the

west side, and thence to place of anchorage still above that point.   Immediately above Montgomery dock was an open space, and above this space was a sand dock provided with a crane for handling merchandise. A large scow lay immediately in front of the sand dock loaded with wood.   By reason of these conditions, it became necessary to navigate the vessel somewhat instream from the start, so as to pass the scow. In other words, by reason of the sand dock and the scow, it was impracticable to navigate the Marthe Roux directly upstream at once along the margin of the stream on the east side.   The mate, Jean Louis Quero, was in charge of the Marthe Roux at the time, the captain being ashore.   Pearson testifies that when ready to move he ordered the mate to let go, and proceeded to swing the ship away from the docks, but that the jib boom caught inside of the jib boom of another ship lying in front of her, and that it was by an accident that he got her back to the dock so as to clear the forward ship; that he then pulled away from the dock, proceeding upstream slowly.   Quoting the language of the witness:

"It was a heavy current; dodging logs and drift as they come along, a few here and there; and the Henderson was working ahead slowly. I was backing full speed. We proceeded about, Oh, for a matter of 25 minutes, I should say, and proceeded up the river probably a half a mile, when there was an immense body of drift, Oh, covering nearly the whole river; anyhow it would be two or three hundred feet across it coming down. Well, I had no way of seeing this drift when I left the dock. The conditions at the time were favorable that I could dodge anything that was out there then, but there was a strong running current which carried this down from above, and the only thing I had to do was to go through the thinnest spot I could find. There was no possible chance of going down the stream. So I went through what I thought was the thinnest piece of the drift. Well, all at once I tried to pull my helm over, and it would not come; I tried the other way and it would not go; so then I stopped the engines and went ahead. I surmised right away what was wrong, that there was something in the rudders, so I went ahead with the wheel, with the intention to throw anything out that would be in there, which it evidently did, because I turned her ahead two or three times, which caused the wheel—then I backed up, and she answered all right. This action of shoving the boat ahead, being made fast on that side of the ship that way, cants the ship. We had no way of steering the ship until we got her going, and when you first start to push on a ship it shoves the ship away; that canted the ship in the current, and before I could recover—that is, to get my wheel back and back her back—the Henderson backing the other way and me this way, why we was going across the river there: well, I could not say how fast, but a pretty good rate of speed across the river. You see, she was neither at that time going up nor down, she was just about stationary; and a strong current, and the canting of the ship in the current that way, the current striking her at an angle, takes her across. Well, we was going across the river, and I see she was going into that dredger when I was in, Oh, I should say 75 feet of the dredger. Well, then, I did the best thing that I considered under the circumstances.   *   *   *   I told the Henderson to let go, and I let go myself to let the dredger take on the ship. She was at an angle, Oh, of about three degrees with the current then going across the river; and so we let go, doing what I thought was the best under the circumstances, and when the ship hit the dredger, as I knew she would, why she would slip on by and I would be with the boat there, and the Henderson was below, we would pick her up again. Well, we let go, but this mate that was on the ship was a very excitable one, and he could not understand much English, and when I let go, why he evidently supposed, I guess, that we was just turning loose to let him go. Well, he goes to work and he lets go his anchor, mind you, head downstream, with a strong current; he let go his anchor. Nobody said any-

thing to him. The sum and substance of it was, instantaneously the ship come around like that (indicating). Why, he let go when he was in probably 75 or 50 feet from the dredger. Just as soon as we let go he let go. That brought the stern of the ship, got it over in the current, and brought her in faster and harder against that dredge, and very nearly caught me. As a matter of fact, he tore the fenders and a few things off of the side of the boat. I got out of there by just a miracle."

Speaking again of the drift, witness says:

"It was an immense body of sticks and trees and logs and timbers, all characters of stuff, even houseboats and such old trash that would pile up on a bank, and when the high water come it would come off. * * * This was nearly solid; there was a thin place here and there through it."

Speaking further as to the direction the vessel was navigated, the witness continued:

"We would come up straight—straight with the current; then we went to pull over; that would angle her a couple of degrees. It don't take much of that strong current to cut a ship sideways. A couple of degrees, and we would come over that way clear, and if I thought I was clear, whatever was behind me, then I would cut over again and come straight up. * * * Q. What was the angle of the ship as to the stream? * * * Start with the first: what was your first maneuver when you got away from the dock, how did the tow and the tugs go, and what angles were they with the stream? A. About three degrees, no more. Q. Now, did they ever increase that bearing at any time? A. They did when she was going right to the dredger. Q. About how many degrees was that? A. I should say that was about eight or ten degrees."

The mate testifies that in getting the ship away from the dock Pearson steered at an angle of 45 degrees with the stream, so as to pass the sand dock and scow; that, after clearing them, he tried to head the vessel upstream again, but was unable to do so; that he succeeded slightly, but the current was so violent that he was driven back; that when he saw the conditions got worse—seeing that the barge was lying there, and knowing that something had to happen, and seeing that there was plenty of space, when he reached a certain point in his effort to head upstream again and did not succeed, to reverse the machinery and take the vessel down in the current of the river—instead of doing what any other mariner would have done, he kept on going across the river, and, when the vessel came in proximity with the dredge, he let go the tugs; whereupon witness dropped the port anchor of the Marthe Roux, and right away she came into collision by her port bow, about the main hatch, on the after starboard quarter of the dredge, and the current carried her port quarter against a scow lying to the rear and to the west of the dredge. In the opinion of the witness, the vessel would have crushed the dredge entirely had he not let go the anchor when he did. And he further states that the chain was not tight when he hit the dredge, but that nevertheless the shock was minimized by the action of the anchor. There was lying in proximity to the dredge the Eugene Schneider, a vessel moored to the dock, by the side of which, instream, were two scows, the dredge lying somewhat further instream than any of these craft. Subsequently the dredge was taken away downstream, the scows removed, and the Marthe Roux made fast alongside the Schneider.

The narratives of these two witnesses comprise the salient features

of the testimony in the case relative to the facts leading up to the collision. The libelant claims that, upon the testimony thus adduced, it is entitled to damages, and the respondent insists to the contrary.

In a case like this, the tug becomes the dominant mind. It supplies the propelling force which is to carry the tow to its destination. The tow is essentially inanimate, without mind to direct its maneuvers, or power to carry them on. All, therefore, depends upon the tug for direction and for navigation. It is true that the officer upon the tow may, and often does, assist in maneuvers, but he is under the direction of the navigating officer upon the tug, and subject to his orders. The tug does not become a freighter for the transportation of freight as a common carrier, but its undertaking is to observe ordinary diligence, skill and precaution to carry the tow safely to its destination. The ordinary diligence, skill, and precaution here spoken of is comparative in its significance. It must take into account the attendant circumstances and conditions. If the work undertaken is difficult and perilous, the diligence and skill required are correspondingly great, and must at all times be commensurate with the danger involved. A brief reference to the authorities will substantiate this position. Mr. Justice Strong, in the case of The Steamer Webb, 14 Wall. 406, 414, 20 L. Ed. 774, says:

"It must be conceded that an engagement to tow does not impose either an obligation to insure, or the liability of common carriers. The burden is always upon him who alleges the breach of such a contract to show either that there has been no attempt at performance, or that there has been negligence, or unskillfulness to his injury in the performance. Unlike the case of common carriers, damage sustained by the tow does not ordinarily raise a presumption that the tug has been in fault. The contract requires no more than that he who undertakes to tow shall carry out his undertaking with that degree of caution and skill which prudent navigators usually employ in similar services."

This language is adopted in the later cases of The Propeller Burlington, 137 U. S. 386, 391, 11 Sup. Ct. 138, 34 L. Ed. 731, and The J. P. Donaldson, 167 U. S. 599, 603, 17 Sup. Ct. 951, 42 L. Ed. 292. So, in the case of Transportation Line v. Hope, 95 U. S. 297, 299, 24 L. Ed. 477, the court says, adopting the language of the lower court:

"By the contract between the parties, the defendants undertook to tow the plaintiff's barge from Jersey City to New Haven. As a necessary incident of this engagement, the defendants were entitled and were bound to assume supreme control and direction of the plaintiff's boat, and of the persons in charge of her, so far as was necessary to enable them to fulfill their engagement, and they were bound to exercise such degree of diligence and care as a prudent and skillful performance of the service for which they stipulated would require."

Again, in the case of The T. J. Schuyler v. The Isaac H. Tillyer (C. C.) 41 Fed. 477, 478, it is said:

"While the tug did not stipulate for the absolute safety of the schooner, yet she was bound to meet such requirements of her service as would enable her to render it with safety to the schooner. She must know the depth of the water in the channel; the obstructions which exist in it; the state of the tides; the proper time of entering upon her service; and, generally, all conditions which are essential to the safe performance of her undertaking. If she failed in any of these requirements, or in the exercise of adequate skill or care, she is justly subject to an imputation of negligence."

And in The Inca (D. C.) 130 Fed. 36, this doctrine is announced:

"A tug, undertaking a towage service, is bound to the exercise of ordinary care and maritime skill, and the master is bound to know the channel, and its usual currents and dangers, which are known generally to men experienced in its navigation, and to exercise such skill and knowledge for the protection of his tow."

This case was affirmed by the Court of Appeals. 148 Fed. 363, 78 C. C. A. 273.

Numerous other cases might be cited to the same purpose, but it is not deemed essential, as the holding of the courts is practically uniform upon the subject.

Returning to the question, Did the tug perform the service undertaken with reasonable care, precaution, and skill, considering the conditions then prevailing? I speak of the tug in the singular, because the Oklahoma was really the dominant mind. The Henderson was taken to its assistance, but was wholly under the direction of the Oklahoma, through Pearson, who was the navigator of both tugs, with the tow. Pearson observed the condition of the river, and was aware that more than ordinary precautions were necessary in order to handle the bark with safety, for he thought that one tug was insufficient for the service, owing to the high current then running in the river, and he took to his assistance the second tug. He knew, also, that considerable drift was running, and appreciated that much care was to be observed if he performed his task with safety. There is a controversy between him and the mate on the Marthe Roux respecting the manner in which he got away from the Montgomery dock. The mate thinks that Pearson started at an angle of about 45 degrees with the current, and recovered but slightly from that position up to the time of the collision, although in the meantime he moved upstream some distance from the point of departure. Pearson has said, in effect, that he got away from the dock, and thereafter alternately heading straight upstream and cutting across at an angle of from three to eight or ten degrees, not greater than that at any time, endeavored in that manner eventually to cross the river to a point near the Albina ferry landing on the west side; that he so proceeded until he encountered the heavy drift, when the rudder of the Oklahoma was fouled; that, in order to free the rudder, he stopped the engines and went ahead; that by this maneuver he lost control of the ship, and she was carried by the current down against the dredge. He did not observe this drift when he started, and I take it that, if he had seen it, he would not have left the dock until it had gone by. But, however this may be, it does not seem to me that he observed ordinary precaution in attempting to navigate the three vessels through the drift, which he describes as "an immense body of sticks and trees and logs and timbers, all characters of stuff, even houseboats and * * * old trash." At the time he encountered the drift, or immediately prior thereto, he could have gone down the stream having a free way, and been enabled thereby to avoid it, or at least to avoid endangering other craft in the immediate vicinity. He had been dodging logs and drift, as he says, on his way up, going first to one side, then to the other, and why he should have attempted to force his way through this great mass of stuff, with the rudders of both the Okla-

homa and the Marthe Roux exposed, is wholly unaccountable. Pearson states, it is true, that when he came upon the drift there was no chance of going down the river. But the mate of the Marthe Roux was of the contrary opinion, which impresses me as the more reasonable view of the situation. Pearson had absolute control of the tow, according to his own statement, prior to, entering the drift, for it was thereafter that he lost control. If such was the case, he could readily have reversed his engines and drifted down, in advance of the drift, to a point at least where he would have encountered no shipping in further endeavor to avoid the drift. When he found his tugs in peril, and if it be, as he says, that by letting go the Marthe Roux less damage would be done to herself and the dredge by gliding by, he was probably justified in disengaging the tugs. But the fault that was inexcusable was in attempting to cut through the large drift, whereby he lost control of the tow. He might have gone through safely if he had not been backing; yet manifestly there would have been danger in that.

Without further discussion of the evidence, I am strongly impressed that Pearson did not observe the ordinary skill, care, and prudence required of him in navigating the craft intrusted to his care. Nor do I think the fact that the mate let go his port anchor when he saw that he was deserted by the tugs added to the injury to his vessel. In this, the mate was excusable. At any rate, if he committed error, it was an error of judgment, thought by him to be the best thing to do under the circumstances. It is quite probable, however, that he prevented greater damage to both his vessel and the dredge with which he collided. The respondent is therefore liable for whatever damage the Marthe Roux sustained by the collision.

Two other questions are presented: First, what is the measure of the damages sustained by the ship; and, second, at what rate should demurrage be allowed for the detention of the ship pending repairs? Four thousand and six hundred dollars is claimed as damages to the ship. Soon after the collision—I may say the next day and the day following—three surveyors, all deemed to be competent by the parties, and later a diver, also a competent person, were called to make examination of the ship and report as to the damages she had sustained. These surveyors went carefully and scrupulously into every detail of injury to the ship's hull, tackle, and equipment, and made their estimates of the amounts which would be sufficient for the repairs. These amounts ranged from $700 to $1,000. After the vessel had proceeded to Liverpool, she was twice docked in the Birkenhead dry dock, and repaired at a total expense, including the attendance of a representative of the owners from Paris and agents' charges, of some £774 in English money. A part of this proctor for libelant admits was for general repairs, and not properly chargeable against respondent, and a great portion of it cannot be traced directly to the injuries found by the appraisers at this port to have been sustained by the vessel. True, the ship was not in dock here, and the opportunity for making a thorough survey of the injuries in every detail was not so good as in Liverpool. But, so far as it relates to the main injuries received, the opportunity was ample for making an approximately accurate estimate, with the exception, perhaps, as it respects the condition of the rudder. Of this latter item

later. There is wide difference between the appraisers' reports here and that made at Liverpool. I need refer to one item only as illustrative. The Liverpool report recommends that cement in waterway on port side be cut away for about the length of 150 feet, and on starboard side 20 feet, and replaced with new cement. This is what is charged for as to that:

"To * * * cutting out and renewing cement in waterways in port and starboard sides, cutting out and renewing cement in donkey house."

McIntosh, one of the surveyors here, testifies:

"We went along all that waterway, and we didn't find any cement cracks or anything. * * * Inside the engine room they took off cement and repaired the flue to the deck; we didn't see anything of that here."

Capt. Hoben, another of the surveyors here, says:

"The cement along the main deck on both sides of the ship was intact; there was nothing wrong with the cement whatsoever, not even by the place —the indent was at the bulwark; the cement wasn't fractured in any way, not disturbed."

Yet damages are claimed for this item of repairs. Other items of grave difference exist between the surveys here and there. As it relates to the rudder, the survey there shows the following:

"Rudder tiller found forced out of line with rudder being canted 7½" to port in 4 ft. radius. Rudder stock found to be twisted, second stiffening arm of rudder plate fractured and others (4) badly slackened on rudder post. Second and lower pintles bent and slackened. Rudder altogether badly strained."

Both Capt. Veysey and Capt. Hoben made careful survey of the steering gear, and found nothing wrong with it except at one position the rudder moved as if binding slightly. Hoben says:

"Now, I plumbed that rudder, with a seaman on deck; certainly if the rudder was out anything, I could have seen it. It might have been out a half an inch, or something like that, my eye ain't that sharp; but then it was out nothing no more than any other ship's rudder."

Veysey is equally specific. True, there was not the advantage of examining the steering gear, by reason of the vessel being in the water, as well as if it was on the dock, but the fact remains that the vessel was pronounced seaworthy, and went to sea in the condition in which the alleged injuries placed her. In order to make thorough survey of the vessel about the parts supposed to be injured, she was listed to starboard by shifting a large part of her load, and her port side was so exposed above the water-line as to give very satisfactory opportunity for ascertaining the damages sustained. Other important differences exist between the surveys here and that made in Liverpool, but these touching the cement gutters and the rudder are sufficient to indicate very strongly that conditions were not the same there as here. And this might well be. The case is pertinently stated by Capt. Hoben. When asked if he could take the Liverpool report and pick out therefrom the repairs that were necessary by reason of anything that he found the vessel to have received here, he answered:

"I don't think so, sir, because there are so many things may have happened between the time the ship left here and she arrived at home. One heavy sea

may have struck her, and that sea could have done all the damage she sustained during the voyage home, and unless I could see an abstract from that ship's logbook recorded and signed by the master and mate, I could not be in a position to tell you—to eliminate from those documents that have been read before us what is attributable to the damage as I saw it and what was attributable to the damage as the surveyors saw it after her arrival at Birkenhead in the dry dock. I claim opinions are like watches, none go alike, yet each man believes his own."

Again, he was asked:

"What explanation, if any, have you to offer for the repair that they made to the rudder, as detailed in this report, in view of your testimony that you found the rudder and the steering gear in perfect condition here?"

And he answered:

"Well, that could be caused— There could be several causes for that, sir. In the first place, the rudder could be struck by a heavy sea; it might have also been caused probably by the ship touching somewhere and swinging around on her keel, getting imbedded in sand; it may have been also caused by colliding or striking some floating matters, a derelict, perhaps just something below the water, which we sometimes run up against, or sometimes see while we are at sea. But I cannot associate my mind with the fact that that rudder was in that position at the time that I made the survey of the ship. I can't associate the seven inches and a half, if I remember rightly was what the rudder was out of line—I cannot associate my mind, or get it to agree that it could possibly be that without my observing it here at the time I made the survey."

The log of the ship on her voyage hence was not produced, nor was any evidence given to show what were the incidents she encountered, and the nature thereof. It is therefore impossible to say that the ship was in the same condition practically when she arrived at Liverpool, after a long voyage, that she was here just prior to her departure.

I have not overlooked the report made by Rio, captain of the Sully, and Le Meilleur, captain of the Eugene Schneider, who recommended that the ship be docked here, because it was thought that the examination could not be made sufficiently thorough while she was in the water. It is significant that their report of the damages sustained was not materially different from the surveys of McIntosh, Veysey, and Hoben, and all these latter surveyors were satisfied that the ship could safely go to sea in her condition.

While, ordinarily, in legal contemplation, the cost of repairs for damage by collision is proved prima facie by testimony that the repairs were rendered necessary by reason of the collision, that they were made, and at the lowest figure, and that the bills rendered therefor had been duly paid (Orhanovich v. Steam Tug America [C. C.] 4 Fed. 337; The Armonia, 81 Fed. 227, 26 C. C. A. 338; The Bratsberg [D. C.] 127 Fed. 1005; Thompson v. Winslow [D. C.] 130 Fed. 1001), yet the principle can hardly be controlling here, for two very cogent reasons: First, it is admitted that some of those items were for general repairs, not referable at all to making whole the injuries sustained to this ship. Further, in this relation, there were repairs made other than those admitted that were manifestly of the same character. Second, it is manifest, from the testimony and the reports of the surveyors, that the conditions of the ship were not the same as they were in Portland prior to her departure. Nor is it possible to segregate the

repairs made that are referable to the injuries really sustained here from those which were general in character, and pertained to injuries otherwise sustained, and the ordinary wear and deterioration of the vessel in the meanwhile. The much more satisfactory evidence, therefore, touching the amount of damages sustained by the vessel, is that given by the surveyors here before she underwent the incidents of the voyage home.

I will assess the damages recoverable at $1,000, adding interest at 6 per cent. per annum from the date of the collision.

As to the demurrage, the libelant is contending for the usual charter rate, which is, as stated by Capt. Hoben, eight cents per day per ton upon the net tonnage of the vessel. This rate, as is well known, is the one ordinarily stipulated for in charter parties, and is imposed in the way of a penalty for delay in loading. It does not purport to measure the earning capacity or value of the ship from day to day, and constitutes an agreement wholly between the parties to the charter party. Where there is no other evidence touching the earning value, proof of the stipulated demurrage will be sufficient to make a prima facie case for delay incident to injuries arising from the fault of the respondent. Orhanovich v. Steam Tug America (C. C.) 4 Fed. 337; The Silica v. The Lord Worden (C. C.) 30 Fed. 845; Thompson v. Winslow (D. C.) 130 Fed. 1001. But where the earning capacity can be otherwise ascertained, it is the safer and better measure of, relief. "The general rule in collision cases," says Hawley, District Judge, sitting in the Circuit Court of Appeals (The Columbia, 109 Fed. 660, 671, 48 C. C. A. 596, 607), "is that the measure of damages is the actual loss suffered." See, also, The Armonia, 81 Fed. 227, 26 C. C. A. 338. The language of Mr. Justice Brown in The Conqueror, 166 U. S. 110, 127, 133, 17 Sup. Ct. 510, 516, 519 (41 L. Ed. 937) covers the case completely. He says:

"It is not the mere fact that a vessel is detained that entitles the owner to demurrage. There must be a pecuniary loss, or at least, a reasonable certainty of pecuniary loss, and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure, or, as was said by Doctor Lushington in The Clarence. 3 W. Rob. 286: 'There must be actual loss and reasonable proof of the amount.' In other words, there must be a loss of profits in its commercial sense. In all the cases in which we have allowed demurrage the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was determined either by the charter value of such vessel, or by her actual earnings at about the time of the collision."

The charter value of a vessel may be considered to be the market price of her hire. And, says Mr. Justice Brown in another place in the same opinion:

"The best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market."

This market value is sometimes, perhaps often, difficult of ascertainment. It follows, therefore, in the absence of proof of such value, that the next best criterion for determining the loss sustained by delay is the vessel's earning capacity, if that can be measurably ascertained.

In the case at bar, by agreement of counsel, a statement was admitted in evidence for the consideration of the court of the average net earnings of the Marthe Roux for five consecutive years immediately preceding the casualty, which shows the rate of such earnings to be 476 francs and 65 centimes per day, or about $95 per day of our money. This standard I deem to be more satisfactory than the stipulated demurrage for·loss of time in loading, and I am therefore impelled to adopt it as the better measure of damages for the delay. This holding has the authority of The Providence, 98 Fed. 133, 38 C. C. A. 670.

The Marthe Roux intended sailing on the 25th of December, and would have done so had it not been for the collision. The report of the surveyors was completed on the 31st, and no good reason is shown why she could not have sailed immediately thereafter. There should be allowed, therefore, as demurrage seven days' delay at $95 per day, or $685, with interest at 6 per cent. per annum from the time of the accident.