EMPIRE ENGINEERING CO. v. REID WRECKING CO.

(District Court, W. D. New York. January 25, 1919.)

No. 979.

1. COLLISION ⬥134—SUIT FOR DAMAGES—RULE OF DAMAGES.
    The measure of damages for injury to a vessel in collision is the amount necessary, to restore the vessel to the condition in which she was at the time of collision, regardless of enhancement in value.

2. SHIPPING ⬥58(2)—DAMAGES—BURDEN OF PROOF—LIABILITY OF BAILEE.
    Where a vessel is injured in collision through the negligence of a bailee, who has it in his custody, he has the burden of showing that the damage sustained was not the result of his fault.

3. NAVIGABLE WATERS ⬥26(3)—DAMAGES—VESSEL STRIKING SUNKEN DREDGE.
    Report of a commissioner upon damages recoverable for injury of a sunken dredge in collision with a passing vessel reviewed and revised.

In Admiralty. Suit by the Empire Engineering Company against the Reid Wrecking Company. On exceptions to report of commissioner. Modified.

Harrington, Bigham & Englar, of New York City, for libelant.

Holding, Masten, Duncan & Leckie, of Cleveland, Ohio, for respondent.

HAZEL, District Judge. The steamer Wissahickon, on June 11, 1913, collided with the sunken steel dredge Pocantico in Lake Erie, because of the failure of the Reid Wrecking Company, in the possession of which the dredge then was, to use ordinary care to mark the place where she lay in deep water in the path of steamers. The Wissahickon (D. C.) 226 Fed. 345.

In the event of an extraordinary occurrence, or in case of failure to skillfully perform work, by reason of which a bailor sustains loss, the burden ordinarily is no doubt on the bailee to prove that the loss was not caused by his negligence or want of care and precaution; and in estimating the damage, in case of bailee's negligence, it is necessary for the bailor to show that the article was in good condition when delivered to the bailee (6 Corpus Juris, 1157–1162, § 165); the measure of damage being the difference between the value of the article at the time of delivery and its value at the time of return.

[1] In admiralty, however, the rule of restitutio in integrum is applied as the measure of damage for injury to vessels from collision; that is, sufficient damages are allowed to restore the vessel to the condition in which she was at the time of the collision, regardless of enhancement in value. The Baltimore, 8 Wall. 377, 19 L. Ed. 463. In The Providence, 98 Fed. 137, 38 C. C. A. 674, Judge Putnam said:

"The rule of restitutio in integrum is a profitable one, in almost any view of it, to the owner of the injured vessel, and, ordinarily, on its fullest application, it ought not to be practically extended beyond what the necessity of the case requires. There may be instances where adjacent parts which are unsound are so closely connected with the parts directly injured by the collision that they cannot be distinguished in making repairs, so that repairs

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of all the parts amount only to repairs of a single whole; but in order to establish a proposition of that kind, and thus enlarge the field of application of the rule restitutio in integrum, the facts should be very clear and strong."

In a case of this kind it has been held that payments by the owner for repairs, certified by the master who superintended the work, were "primary proof of the expenditure, and of its purpose and its necessity, and, unless answered by counterproof, was altogether sufficient to justify the allowance of such payments." Orhanovich v. Steam Tug America (C. C.) 4 Fed. 337; The Bratsberg (D. C.) 127 Fed. 1005.

[2] Although these cases were for collision, in which the element of bailment did not enter, still I think that, where a vessel is injured through the negligence of a bailee who has the vessel in his custody at the time of the damage, he has the burden of showing that the damage to the vessel was not sustained through his fault (Swenson v. Snare & Triest Co., 160 Fed. 459, 87 C. C. A. 443; Terry & Tench Co. v. Merritt & Chapman Derrick & Wrecking Co., 168 Fed. 533, 93 C. C. A. 613), and that in the ascertainment of the loss upon a prima facie showing that the repairs were necessary, and caused by the fault of the bailee, a case for recovery is made out unless there is contrary evidence of a more reliable character.

It is, of course, necessary that the condition and serviceableness of the injured vessel or parts, prior to the collision, be shown with reasonable certainty. If it appeared in this case, for instance, that the parts of the dredge, or any of them, were injured by the act of sinking, or because the bad weather shifted the dredge while at the bottom, or incidentally from the wrecking operations, then there could be no recovery herein; but there was satisfactory evidence to show injury to parts of the dredge from the collision.

[3] Libelant contended at the outstart that the entire cost of repairing the dredge ($23,169.10) should be recovered from the respondent; but concededly there was inadequate evidence to support any such claim, and the commissioner made an allowance of $11,689 to cover parts of the dredge injured in the collision, as follows:

| | |
|---|---:|
| Turntable | $4,422 |
| A-frame | 2,967 |
| Truss or girder | 376 |
| Spud casing | 2,684 |
| Deck plates | 840 |
| Surveyors' fees | 400 |
| | $11,689 |

It appeared that two competent divers made examinations of the sunken dredge at different times, and reported as to the character of the injuries she had sustained, and that surveyors gave testimony as to the estimated cost of repairs of some of the parts, while the actual cost price of replacement of others was given.

It is shown that on June 15, 1913, two days after the dredge sunk, a diver in the employ of libelant made an examination of her, and reported that she was resting on the bottom, in about 35 feet of water; that she was in good condition, except that her anchor was broken on

the port side, and was settling on the end of the dredge; that her port spud was straight in the casing, with only its end under the boat broken off, while her starboard spud was lying over the top of the dredge; and that her deckhouses, sister sheaves, boom, A-frame, and turntable or quadrant were intact and all right.

In July, before the collision, a diver (Meyers) in the employ of the respondent examined the Pocantico for the purpose of preparing to raise her. He testified that the casting under the turntable or quadrant was broken; that the houses were off the deck, the beam over to port, the dipper on the bottom, the A-frame hard aport, and the spuds fastened in the casings with throw bolts; and that the starboard spud could be unshipped entirely, although there was difficulty in unshipping the port spud, as it was listed more to port than was the dredge. At the trial he stated that the casting marked on the blue print was the only one broken up to the time of the collision, so far as he observed, while after the collision he found the tops of the spud casings crushed in. Another diver (Baker) in the employ of respondent partially examined the dredge in July and found her lying in 42 feet of water, her boom swung to port, her after guys, which had been connected to the A-frame, carried away, and the port spud broken off. From such testimony, and from the exhibit photograph in evidence, taken after the boat was raised, libelant contended that the prima facie evidence showed that the turntable and A-frame, together with the spud casing (except the gates and truss), were in good condition prior to the collision, while respondent insisted that in foundering, the dredge in all probability struck the bottom with sufficient force to produce nearly all such injuries.

The repairs to the turntable resulted in practically a new turntable in place of one used for approximately seven years; but usage does not always affect cost of replacement, which is the controlling factor. The question is: Was there evidence to show that the turntable and appliances were broken in consequence of the collision? To establish such breaking there is the testimony of the witness Allen to the effect that he found a groove one-fourth of an inch deep across the top of the sheaves and casting of the turntable, and there was testimony showing that the draft of the steamer Wissahickon, the width of her shoe, the height of the sister sheaves of the dredge from the deck, as well as the depth of the dredge at the time of the collision, together with the depth of the water over her at such time, supported the deduction that the shoe of the Wissahickon at the lowest part, in passing over the dredge, would come in contact with the sheaves of the dredge.

There was dispute with reference to the depth of the water where the dredge lay; the witness Learmann testifying to a depth of 35 feet, and the respondent's witness Meyers to a depth of about 42 feet. This dispute the commissioner correctly decided adverse to the respondent. The expert witnesses, Smith and Weisbeck, substantially testified that the damage to the turntable and its appliances was in their opinion caused by the truss falling thereon, and that the contact of the Wissahickon with the A-frame would be of such force as to fracture the turntable. In falling, the truss, as contended, might have struck

the casing of the boom and broken it; but for this part no allowance was made by the commissioner. Indeed, no damage to the boom was claimed; it being conceded that the evidence to establish the cost of repairing such item was insufficient. The allowance for repairing the turntable is approved, except the sum of $600 included for patterns, since I think the evidence as to the cost of such patterns was insufficient; although it appears that new patterns for parts were actually obtained, there is nothing to show what part of the total was required for the turntable pattern.

The A-frame was intact when the divers examined the dredge, but respondent contends that the cost of replacing it was not sufficiently shown. The surveyors testified that the cost of such repairs was taken from the bills of the dry dock company. although the cost of different items was not kept separately. The expert witnesses, however, in my opinion, fairly estimated such cost; but, as they included therein $600 for patterns for making a new A-frame, the same criticism is made as was made in connection with turntable patterns. Deducting this amount, $2,367 is left for the A-frame.

The commissioner allowed $376 for the truss, but according to the evidence, as I view it, the estimated price thereof was $300, and the latter amount is therefore allowed.

The allowance for spud casings was $2,684, which included both the port and starboard casings. The port casing was injured at the top, while the starboard casing was twisted a little. The witness Allen seemed uncertain as to the character of the damage, and I am in doubt as to whether the injury to the starboard casing was due to the collision. It may have been driven into the bottom when the dredge went down, as the evidence shows, bow first, and to port. Meyers testified that the tops of the spud casings were not broken until the collision; but the evidence in relation to the extent of the injury, and necessity for new casings in their entirety, and to the cost price, is not as clear as it should be, and the amount of $2,684 for spud casings is therefore disallowed.

The cost of deck plates, which it is believed were injured because of the breaking of the turntable, is allowed at $420. The cost of replacing the deck plates was $840, but as to such parts the repairs should be most closely scrutinized; nor do I think the rule of restitutio in integrum should be strictly applied thereto, especially as such plates had been subjected to severe strains for a number of years—severer strains than had any of the other parts with which we are herein concerned.

A charge for services of one surveyor only will be allowed, since one of the surveyors was in the employ of the Buffalo Dry Dock Company and his services related to the entire damage, including items for which respondent was not liable.

On account of the delay in presenting the case for hearing, interest will be computed on the amount allowed herein only from the date of the commissioner's report.

Report of commissioner modified as herein specified.